Filed 4/21/15; pub. order 5/15/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JEFFERSON STREET VENTURES, LLC, | |
| Plaintiff and Appellant, | G049899 |
| v. | (Super. Ct. No. INC072101) |
| CITY OF INDIO, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Riverside County, John G. Evans, Judge.  Reversed and remanded with directions.

Manatt, Phelps & Phillips and Michael M. Berger for Plaintiff and Appellant.

Richards, Watson & Gershon, Gregory M. Kunert and Saskia T. Asamura for Defendant and Respondent.

Jefferson Street Ventures, LLC (Jefferson), appeals from a judgment in favor of the City of Indio (the City) in this combined petition for writ of administrative mandamus/inverse condemnation action. In 2007, the City conditioned approval of Jefferson's 2005 application for development of a shopping center upon Jefferson leaving approximately one-third of its property undeveloped to accommodate the reconstruction of a major freeway interchange that was in the planning stages. The City intended to eventually acquire the development-restricted property through either eminent domain or negotiated purchase. But it could not acquire the property at the time Jefferson's development application was approved due to funding constraints imposed by the byzantine planning and review process for the interchange that involved various local, state, and federal agencies, and which the City did not anticipate being complete for at least a few more years—as it turned out it was almost seven. When Jefferson's development application was being approved, City staff explained the City could not allow development on the part of the site designated for the interchange because the City would incur additional costs for the property if and when it was later taken for the interchange.

Jefferson sued the City contending the development restrictions were invalid because they constituted an uncompensated taking of its property. Following a hearing on the writ petition, the trial court found the development restrictions were permissible and denied the writ. Although the court originally declined to consider whether the facially valid development restrictions nonetheless amounted to an uncompensated taking, it subsequently granted the City's motion for judgment on the pleadings on the inverse condemnation causes of action agreeing the ruling on the writ petition included a finding there was no compensable taking.

On appeal, Jefferson contends: (1) the trial court erred by denying its petition for writ of administrative mandate because the City's development restrictions constituted an uncompensated taking; and (2) regardless of the ruling on the mandamus

2

cause of action, the trial court erred by denying it a trial on its inverse condemnation claims. We agree with the former contention and conclude the restrictions constituted a de facto taking of the development restricted portion of Jefferson's property and the trial court erred by denying Jefferson's petition for writ of mandate.

In *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 7 (*Hensler*), our Supreme Court held a landowner alleging government action constitutes an uncompensated taking must first challenge the action by way of a writ of mandate so as to "afford the local entity the opportunity to rescind its action rather than pay compensation for a taking." In this case, however, that option appears to now be foreclosed. While this appeal has been pending, responsibility for rights-of-way acquisition for the interchange project has been transferred to the County of Riverside (the County), and in February 2014, the County commenced a direct condemnation action to acquire the requisite portions of Jefferson's property for construction of the interchange. The direct condemnation action will encompass many, if not all, of the damage claims Jefferson asserts against the City in this action. However, we cannot conclude this action is moot because the direct condemnation action has not proceeded to trial or final judgment. Accordingly, although we reverse and remand for further proceedings, we also direct the trial court to consider consolidation of this action with the direct condemnation action so as to avoid duplication of damages.

FACTS & PROCEDURE

*The I-10/Jefferson Street Interchange Project*

Jefferson is the owner of a vacant 26.85-acre parcel of land located in the City (the Property). The Property is bounded by the I-10 freeway to the south, Jefferson Street to the west, and Varner Road, which curves around the property's northern perimeter from Jefferson Street tapering down to the I-10 and then running parallel to the I-10 freeway. The Property is surrounded by mostly vacant land.

3

The I-10/Jefferson Street interchange was one of several I-10 interchanges in the Coachella Valley slated for reconstruction and enlargement to accommodate increasing population growth and development in the area. The reconstruction of the I-10/Jefferson Street interchange will require acquisition of rights-of-way including a portion of Jefferson's property.

Since the late 1990's, numerous governmental agencies have been involved in studying, planning, and funding the I-10 interchange projects including the Federal Highway Administration (FHWA), the State of California, Department of Transportation (Caltrans), the County, the Coachella Valley Association of Governments, and the City. The City was originally designated as the responsible agency for the I-10/Jefferson Street interchange (hereafter the Interchange Project). Preparation of the requisite environmental studies for the Interchange Project began in 2001. Those studies had to meet requirements of both the National Environmental Policy Act of 1969 (NEPA, 42 U.S.C. § 4321 et seq.; 49 C.F.R. §§ 1105.6, 1105.7), and the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000, et seq.; Cal. Code Regs., tit. 23, § 3775, et seq.). Acquisition of rights-of-way for the Interchange Project could not begin until all environmental review was complete and approved. As the City's public works director explained to the city council in March 2007, the average time for a NEPA document on an interstate highway interchange project to wend its way through all the requisite federal and state agencies was about seven years. And as the City's community development director explained in August 2007, state and federal funds could not be released until environmental review was complete and the City had no control over the federal environmental review process.

There were three potential configurations for the Interchange Project identified by Caltrans—Alternatives 1, 2, and 3. Although some environmental studies were pointing to Alternative 1 as early as 2003, by November 2005, the City's staff was designating Alternative 3 as the preferred configuration. However, as will be explained

4

anon, in 2007, the city council selected Alternative 1 as its preferred Interchange Project configuration.

*Jefferson's Project*

At some point, Jefferson acquired the Property. In 2004, Jefferson began consulting with City staff on its development plans for the Property and on July 27, 2005, Jefferson submitted a proposal to the City for development of a retail shopping center on the entire 26.85-acre parcel.

Jefferson's development proposal, Project Master Plan No. 05-01-38 (hereafter the PMP), was for about 20 buildings with a combined total square footage of 248,600. It placed the largest buildings, including the proposed supermarket "anchor tenant," along the I-10 perimeter of the Property facing towards Varner Road. A triangular area at the southeast end of the Property (where Varner Road tapers towards I-10 and then runs parallel to it) was not designated for buildings but as a drainage retention basin. The PMP contained an appendix addressing the proposed Alternative 3 configuration for the Interchange Project, which would require acquisition of approximately 15 acres of the Property by the City, including the area most desirable for a supermarket.

The City's planning commission's first public hearing on Jefferson's project was set for May 10, 2006. City staff reported that although the original PMP was for the entire 26.85-acre site, Jefferson had revised its proposal in light of the Interchange Project and the City's preference for Alternative 3, and the revised site plan and proposal was for 17.50 acres with 156,650 combined square feet of buildings. City staff recommended approval noting the PMP was consistent with the City's general and specific plans and zoning ordinances. Staff recommended adoption of a mitigated negative declaration for the project under CEQA. However, before the planning commission meeting, Jefferson informed City staff it would not revise the PMP and wanted approval for the 26.85-acre project as submitted. The planning commission

5

hearing was continued numerous times while City staff and Jefferson worked through various issues.

At the January 10, 2007, planning commission hearing, City staff explained various governmental agencies were still trying to agree on the Interchange Project alignment that worked for all the parties and by this time Jefferson was expressing a preference for Alternative 1 as the least damaging to its project. The City's community development director and the planning commissioners lamented that Jefferson was caught up in a lengthy process involving numerous state and federal agencies, with environmental problems and other issues concerning the Interchange Project that still were not resolved. The city attorney reported the City had just recently received a letter from Caltrans on behalf of FHWA advising the City that NEPA environmental work had to be completed before the City could move forward on the Interchange Project. The public hearing on the PMP was continued to February 14, 2007, and then to March 14, 2007.

On March 7, 2007, the city council held a noticed public hearing to consider staff's recommendation to approve Alternative 1 for the Interchange Project as the City's preferred configuration. The city manager explained the I-10 interchanges had been funded and defunded due to budget problems and urged a decision be made immediately as to the preferred alternative so funding was not lost again. The draft environmental impact report still had to be circulated to the public and reviewed by FHWA, the Federal Transportation Administration (FTA) and at least 15 other agencies—a process staff hoped might be completed in another two and one-half years. Additionally, Caltrans would have to approve the locally preferred alternative.

Jefferson's principal, Charles Ellis, advised the city council that Alternative 1 was the least onerous for its project and urged the city council to approve Alternative 1. The City approved Alternative 1 for the Interchange Project, and authorized staff to

6

solicit proposals to complete construction drawings for the interchange based on Alternative 1.

On March 14, 2007, the planning commission held its final hearing on the PMP. The staff report explained the City had approved Alternative 1 for the Interchange Project, which reduced the developable area of Jefferson's property to approximately 17.1 acres. Therefore, there must be a condition to approval of the PMP that before building permits were issued, Jefferson must submit a revised plan providing for the building envelope for the development to be revised to accommodate the Alternative 1 configuration for the Interchange Project. There was some discussion during the meeting during which Jefferson's project planner explained about how the project might be revised to fit a 17-acre site. Ellis indicated Jefferson was "reluctantly" modifying its PMP (i.e., to accommodate the Alternative 1 alignment for the Interchange Project), with the understanding the City would be paying Jefferson just compensation for the property being taken for the Interchange Project. The planning commission adopted a proposed resolution recommending the city council approve the PMP subject to staff's recommended conditions.

On July 18, 2007, the city council held its first hearing on the PMP. The community development director explained the approval would allow Jefferson to proceed immediately with development of a 17-acre project, on a site with an as yet unknown configuration, and if the Interchange Project did not eventually get funded (and built), Jefferson could come back and build out the rest of the Property.

Ellis advised the city council that Jefferson did not agree to approval of only a 17-acre project. He reiterated that Jefferson's project had been in the planning process since August 2004 and it had submitted the PMP to the City for approval in January 2005. It was still not clear to him the City would in fact ever condemn the nine acres the City wanted removed from the proposed development (hereafter referred to as the Alternative 1 Acreage). Ellis stated he understood the quandary the City was in—

7

by declaring the Alternative 1 Acreage unbuildable it was effectively taking Jefferson's property now, but the City had to rely on third parties to pay for that taking and it was unknown if and when that would happen. Accordingly, Ellis stated Jefferson did not agree with the staff recommendation to approve only a 17-acre project and it was asking for immediate approval of the full 26.85-acre development described by the PMP.

The community development director again explained the City intended to implement the Interchange Project as quickly as possible, but it would not approve construction in the proposed rights-of-way only to then have to demolish the buildings and relocate tenants in the future. By conditioning approval as proposed, Jefferson could still come back and build out the entirety of the Property if the Interchange Project did not get funded or built. The community development director reiterated that Jefferson would be compensated at fair market value for any land acquired for the Interchange Project at such time as rights-of-way were acquired.

Ellis reiterated Jefferson wanted an "unequivocal commitment" from the City that if only a 17-acre project was approved now, the City would compensate it for the Alternative 1 Acreage. Ellis explained it was not commercially reasonable to build out a 17-acre project and then at some time in the future come back and try to develop the remaining acreage that would be "locked in the rear" (between the 17 acres approved for construction and the freeway) if the Interchange Project was never built. The community development director explained the City could not give commitments beyond the assurances staff had already given—the City could not commit to buying the property if in fact the Interchange Project was never built. The hearing was continued to August 15, 2007.

On August 15, 2007, City staff continued to recommend approval of the PMP with the condition it be revised to exclude the Alternative 1 Acreage and a two-acre temporary no-build area for construction of the Interchange Project. Jefferson continued to assert its position that it wanted approval of the PMP for the entire 26.85-acre parcel

8

and a guarantee of just compensation for "a fully entitled site." City staff again explained that if Jefferson was allowed to develop the entire site prior to construction of the Interchange Project, the City would incur additional condemnation costs for demolition of buildings and relocation of tenants. Staff again observed the environmental clearances for the Interchange Project had not been completed and the property could not be acquired until environmental clearance was obtained. The community development director and the city manager both reiterated the City had every intention of proceeding with the Interchange Project, but it was stuck in the federal approval process. The city attorney confirmed the City was committed to paying just compensation for any eventual taking of Jefferson's property for the Interchange Project. But he also noted there was "so much uncertainty with . . . respect to the interchange . . . ." The city attorney observed that until the federal and state environmental analysis were completed, the City would not know "where the landscape lay" and thus there simply was not enough information to pay Jefferson for any property taken. After an unidentified speaker at the hearing commented that even though Alternative 1 had been selected as the preferred configuration, that did not mean Caltrans or federal authorities would agree with that decision; council members agreed with that assessment. One council member explained, the City was 95 percent certain Alternative 1 would be the alignment, so by prohibiting building in the Alternative 1 envelope, the City was trying to carve out the area that would realistically be available for development. And even if the City was "slightly wrong" about the exact property that would be taken for the Interchange Project most of the Alternative 1 Acreage would get purchased at some point in the future.

At the conclusion of the hearing, the city council approved Ordinance No. 1151, and adopted a mitigated negative declaration, approving the PMP. The ordinance contained two factual findings in support of approval of the PMP: (1) The PMP was consistent with the goals and policies of the City's general plan; and (2) The PMP was consistent with the City's zoning ordinances and met the requirements of the

9

specific plan for the area. The ordinance made approval of the PMP subject to various conditions including the following: condition No. 6, "Prior to the issuance of any building permits, five corrected copies of the [PMP] shall be submitted to the [City's community development director] for review, approval, and filing as the final document for the project, and shall include a revised plan [that] shall provide for a building envelope as permitted for the site under the provisions of the Jefferson Street Interchange Alternative 1[;]" and condition No. 10, "An approximate 2.1 acre 'Temporary No-Build Area' shall be reserved in the southeastern portion [i.e., the triangular area the PMP designates as a drainage retention basin] of the site to the satisfaction of the [p]ublic [w]orks [d]irector which shall prohibit construction in this area until completion of the . . . Interchange Project. Upon completion of the interchange project this area may be developed."

*The Current Litigation*

Jefferson did not revise its PMP or seek building permits for its project. It filed the instant action, a combined petition for writ of mandate and complaint for damages for inverse condemnation, on November 7, 2007. The complaint alleged the City had improperly conditioned approval of the PMP upon Jefferson's leaving the Alternative 1 Acreage undeveloped, plus a temporary no build area of two acres for a temporary off-ramp (hereafter the Temporary No-Build Area), to accommodate the proposed Interchange Project without paying Jefferson just compensation.

The first cause of action for a writ of mandate under Code of Civil Procedure sections 1094.5 and 1085, alleged the findings made on August 15, 2007 (i.e., that the PMP was consistent with the City's general plan, specific plan, and zoning ordinances), supported approval of the PMP as originally submitted. Therefore, Jefferson alleged the City had no authority to condition approval of the PMP on leaving any portion of the Property undeveloped. The complaint's inverse condemnation causes of action contained allegations of a regulatory taking and a forced dedication of private

10

property bearing no nexus to the impact of the proposed project; unreasonable pre-taking conduct and unreasonable delay; severance damage to the remainder of Jefferson's property; and unlawful development conditions. In its prayer for relief, Jefferson sought issuance of a peremptory writ of mandate commanding the City to approve the PMP as submitted, i.e., for the development of the full 26.85 acres. In the event a writ was not issued, Jefferson sought just compensation for a taking of its property, damages for the City's unreasonable precondemnation delay and conduct, plus costs and attorney fees. The trial court stayed the inverse condemnation causes of action until the mandamus cause of action was tried

Jefferson filed its opening brief on the writ of mandate in April 2009. It raised two issues. First, it contended that by conditioning approval of the PMP upon leaving the Alternative 1 Acreage undeveloped to accommodate the Interchange Project plus the two-acre Temporary No-Build Area, the City was illegally regulating land use to depress land value for future acquisition. In making this argument, Jefferson cited to statements made by City staff cautioning against allowing Jefferson to build in the proposed rights-of-way area because it could result in the City incurring costs relating to demolition of those buildings and tenant relocation if and when that property was condemned. Jefferson also argued the conditions constituted an unlawful exaction/forced dedication of its property.

Following a hearing on the petition for writ of administrative mandamus, the trial court issued its statement of decision denying the writ. The court found there was no evidence the City acted in excess of its jurisdiction because its police power necessarily included the authority to plan for major infrastructure improvements and there was no evidence Jefferson was denied a fair hearing. Turning to the specific arguments Jefferson made, the trial court found the record did not support a finding the City was acting so as to depress the value of property to be taken, or to coerce Jefferson into accepting a particular price for its property if it was ever condemned. There was no

11

change in the zoning and "[a]ll that can be said is that the City restricted [Jefferson's] right to build on a portion of its property until such time as the proposed interchange plans were accepted or rejected." The court specifically stated it was not deciding in the mandamus proceeding whether the development restrictions effected a compensable taking or were an unlawful exaction observing "whether or not the City requires you to keep that land fallow, that you're entitled to compensation, that's not before me. [¶] . . . [¶] [T]hat issue is not one I'm deciding. I'm not making that decision based on your writ." The trial court entered a judgment on the mandamus cause of action on June 30, 2009, but later clarified it was an interlocutory judgment only.

On August 16, 2011, the City filed a motion for judgment on the pleadings under Code of Civil Procedure section 438 as to the remaining inverse condemnation causes of action. The City argued the trial court's ruling denying the writ of mandate barred Jefferson's takings claims. Jefferson opposed the motion noting the trial court specifically did not decide the takings issue, and it was entitled to present substantive argument and evidence on its takings claim.

The trial court initially denied the City's motion for judgment on the pleadings, stating that in deciding the mandamus cause of action it had not considered whether the restrictions on development resulted in a taking. It set the matter for further briefing "on the limited issue of whether Jefferson['s] writ encompassed the [takings claim] . . . and how the court should proceed from this point." Following receipt of the supplemental briefing, the trial court vacated its prior order denying the motion for judgment on the pleadings and entered a new order granting the motion for judgment on the pleadings. The trial court stated in its minute order that its ruling in the City's favor on the administrative mandamus cause of action constituted a finding the City's actions did not constitute a taking, and therefore Jefferson's inverse condemnation causes of action were meritless "[on] their face."

12

Judgment was entered on January 12, 2012, in favor of the City, and Jefferson filed a notice of appeal.

REQUESTS FOR JUDICIAL NOTICE/POSTJUDGMENT EVENTS

*The City's First Request for Judicial Notice*

On February 28, 2013, the City filed its first request for judicial notice, which we deferred for decision with the merits of the appeal. The City requested we take judicial notice of the administrative record submitted to the trial court on May 5, 2009, in advance of the trial on the petition for writ of mandate. (Evid. Code, §§ 452, 459.) Jefferson agrees we should take judicial notice of the administrative record, and we grant that request.

The City also requested we take judicial notice of a city council agenda report dated October 20, 2009, that was not part of the administrative record and post-dates the trial court's ruling denying the petition for writ of mandate, but which provides some pertinent background concerning the history of the Interchange Project. Jefferson opposes the request. We deny the request for judicial notice of the October 20, 2009, city council agenda report as this document was not part of the administrative record. (See *Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1112 (*Architectural Heritage Assn.*) [appellate court would not consider extra-administrative record evidence].)

*The City's Second Request for Judicial Notice*

On September 17, 2014, this court granted the City's unopposed second request for judicial notice filed August 14, 2014, of public documents regarding events concerning the Property that have transpired since the trial court entered judgment in this case. We took judicial notice of the December 28, 2011, "Cooperative Agreement" between the City, Caltrans, and the County concerning the Interchange Project, which is a public record. Pursuant to the Cooperative Agreement, the County has become the responsible agency for construction of the Interchange Project and has assumed all

13

responsibility for acquisition of rights-of-way for the project "including all eminent domain activities."

We also took judicial notice of the February 11, 2014, eminent domain complaint filed by the County against Jefferson, and various entities owning utility and roadway easements on the Property, to acquire the necessary rights-of-way for the Interchange Project. (*County of Riverside v. Jefferson Street Ventures, LLC et al.* (Riverside County Super. Ct., Case No. PSC1400798, hereafter the County Condemnation Action.) The legal description of the property to be condemned includes the fee simple interest in a 6.277-acre parcel (which the City states is within the footprint of the Alternative 1 alignment for the Interchange Project), a .093-acre road easement, a .152-acre slope easement, and a 3.457-acre temporary construction easement.

In a stipulation filed with this court on April 18, 2014, Jefferson agreed it has not challenged the County's right to take the land that is the subject of the County Condemnation Action, and the issues pending resolution in the County Condemnation Action relate to just compensation for the taking. That stipulation also refers to a second condemnation action filed by the City concerning a small amount of property being acquired by the City for improvement of the Jefferson Street/Varner Road intersection. (*City of Indio v. Jefferson Street Ventures, LLC et al.* (Riverside County Super. Ct., Case No. PSC1400896, hereafter the City Condemnation Action.)

*The City's Third Request for Judicial Notice*

On October 27, 2014, the City filed a third request for judicial notice of additional court documents, which we deferred for decision with the merits of the appeal. Jefferson opposes the request. The documents include Jefferson's motion for leave to file a first amended answer in the County Condemnation Action filed on October 14, 2014. In that motion, Jefferson seeks to amend its answer to include claims for precondemnation damages and to clarify the basis for its claim for severance damages. Jefferson also states the factual basis for its claim for precondemnation damages

14

(damages for unreasonable precondemnation activity) are the same facts that underlie this writ of mandate/inverse condemnation action. The City also asks us to take judicial notice of Jefferson's motion to consolidate the County Condemnation Action and the City Condemnation Action filed on October 16, 2014, because the two actions involve parts of the same subject property owned by the same defendant, the same parties, and the same project. The final document of which the City requests judicial notice is the substitution of attorneys filed by Jefferson in the County Condemnation Action on October 16, 2014, substituting in new counsel in the condemnation actions. We grant the City's request for judicial notice of these documents because they are court records and relevant to the issues in this case.

*The City's Fourth Request for Judicial Notice*

On March 6, 2015, after oral argument in this appeal was heard, but before the matter was taken under submission, the City filed a fourth request for judicial notice. It asks us to take judicial notice of a Riverside County Board of Supervisors agenda report dated January 26, 2015, showing County approval of the construction contract for the Interchange Project. Jefferson opposes the request. We deny the request for judicial notice of the January 26, 2015, report because it was not part of the administrative record (*Architectural Heritage Assn., supra,* 122 Cal.App.4th at p. 1112), and we do not find it useful in resolving the issues before us.

DISCUSSION

On appeal, Jefferson contends the conditions the City imposed on approval of the PMP precluding development on the Alternative 1 Acreage and the Temporary No-Build Area constituted an unconstitutional taking, and therefore, the trial court erred by denying its petition for writ of administrative mandate. Additionally, Jefferson contends the trial court erred by denying it an evidentiary hearing on its inverse condemnation claims. We agree the restrictions constituted an uncompensated taking of the property on which development was prohibited by the City.

15

*1. General Principles of Takings Law*

We begin with some legal background on takings jurisprudence and inverse condemnation. The state and federal Constitutions guarantee real property owners "just compensation" when their land is taken for a public use. (Cal. Const., art. I, § 19; U.S. Const., 5th Amend.; *Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 537 (*Lingle*); *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 773; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 259 (*Shaw*).) This constitutional guarantee is "'designed to bar [g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" (*Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104, 123 (*Penn Central*).)

"[A]n 'inverse condemnation' action may be pursued when the state or other public entity improperly has taken private property for public use without following the requisite condemnation procedures [or] takes other action that effectively circumvents the constitutional requirement that just compensation be paid before private property is taken for public use." (*Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 377, fn. omitted.)

"'The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property'—a categorical taking." (*Shaw, supra*, 170 Cal.App.4th at p. 260.) "When property is damaged, or a physical invasion has taken place, an inverse condemnation action may be brought immediately because an irrevocable taking has already occurred." (*Hensler, supra,* 8 Cal.4th at p. 13; see *Hurwitz v. City of Orange* (2004) 122 Cal.App.4th 835, 847-848.)

Additionally, "'government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster— and . . . such "regulatory takings" may be compensable under the Fifth Amendment.' [Citation.] The United States Supreme Court has recognized 'that a regulation of property that "goes too far" may effect a taking of that property, though its title remains

16

in private hands.  In such a case, the property owner may bring an inverse condemnation action, and if it prevails, the regulatory agency must either withdraw the regulation or pay just compensation.  [Citation.]  Even if the agency withdraws the regulation, the property owner may have a right to just compensation for the temporary taking while the regulation was in effect.  [Citation.]'" (*Shaw, supra*, 170 Cal.App.4th at p. 260.)

"Two categories of regulatory action will generally be deemed per se compensable takings.  First, where government requires an owner to suffer a 'permanent physical invasion' of his property for such things as cable lines, it must provide just compensation.  [Citations.]  Second, where the government action does not result in any physical invasion of the property, the action will still be considered a taking if the regulation deprives the owner of 'all economically beneficial or productive use of [the] land.'  [Citations.]  '[T]he government must pay just compensation for such "total regulatory takings," except to the extent that "background principles of nuisance and property law" independently restrict the owner's intended use of the property.' [Citation.]" (*Shaw, supra,* 170 Cal.App.4th at pp. 260-261.)

Takings challenges outside the above per se compensable categories (those that do not involve a physical invasion or that leave the property owner with some economically beneficial use of the property), may nonetheless go "too far" and be compensable when the regulation substantially interferes with the ability of a property owner to make economically viable use of, derive income from, or satisfy reasonable, investment-backed profit expectations with respect to the property.  (*Lingle, supra,* 544 U.S. at pp. 538-539, citing *Penn Central, supra,* 438 U.S. at p. 124.)  And a condition imposed on a property owner for land use approval will go "too far" when there is no "essential nexus" between the permit condition and a legitimate state interest (*Nollan v. California Coastal Commission* (1987) 483 U.S. 825, 837 (*Nollan*)), or the

17

condition is not "roughly proportional" to the impact it seeks to address (*Dolan v. City of Tigard* (1994) 512 U.S. 374, 385 (*Dolan*)).[1]

"A 'temporary' taking of real property by the government is compensable on the same constitutional basis as a permanent taking. For purposes of the just compensation provisions of the Fifth Amendment, there is no difference between a temporary taking that denies a landowner all use of his property, and a permanent taking. Temporary physical invasions should be assessed according to a case specific factual inquiry. Similarly, whether a temporary regulation constitutes a taking involves an ad hoc consideration of relevant circumstances. The duration or delay resulting from governmental regulations is one of the factors a court must consider in determining the severity of burden of a regulation. Also relevant is the degree to which the invasion is intended or a foreseeable result of authorized governmental action. So too are the character of the property at issue and the owner's reasonable investment-backed expectations. The severity of the interference is also considered." (11 Miller & Starr, Cal. Real Estate (3d ed. 2014) § 30:30, pp. 30-146 to 30-147, fns. omitted.)

A landowner claiming that application of government regulations effects a taking of a property interest cannot sue directly on an inverse condemnation cause of action unless administrative and judicial remedies have been exhausted. (*Hensler, supra,* 8 Cal.4th at pp. 13-14.) This requirement is jurisdictional and not a matter of judicial

---

[1] Under the *Nollan/Dolan* test, a public entity may require an *uncompensated* exaction, such as an easement, as a condition of a development permit only where there is "'rough proportionality'" between the condition and the burden the development places on a public interest. (*Dolan*, *supra*, 512 U.S. at p. 391.) Jefferson argues there was no rational nexus, or rough proportionality, between its proposed shopping center project and the expansion of the I-10/Jefferson Street interchange—the interchange expansion was to accommodate the regional population growth and was not necessitated by its shopping center. Because we conclude there was a de facto taking of the Alternative 1 Acreage and the Temporary No-Build Area, we need not also consider whether the development restriction constitutes an unlawful exaction.

18

discretion.  (*Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 589.)

"[A] claim that the application of governmental regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."  (*Williamson County Reg'l Planning Comm'n v. Hamilton Bank* (1985) 473 U.S. 172, 186.)  This is because until there has been a "final, definitive position" as to how the regulations will be applied to the land, a court cannot determine the extent of the economic impact, a factor that bears on the question whether a compensable taking has occurred.  (*Id*. at p. 191.)

Even if the administrative decision is final, the exhaustion requirement also affords the governmental entity the opportunity to rescind or modify the ordinance or regulation or to exempt the property from the allegedly invalid restriction once it has been judicially determined the proposed application of the regulation will constitute a compensable taking.  (*Hensler, supra,* 8 Cal.4th at p. 13.)  As *Hensler* explains:  "If the alleged taking is a 'regulatory taking,' i.e., one that results from the application of zoning laws or regulations which limit development of real property, . . . the owner must afford the state the opportunity to rescind the ordinance or regulation or to exempt the property from the allegedly invalid development restriction once it has been judicially determined that the proposed application of the ordinance to the property will constitute a compensable taking.  The owner may do so, where appropriate, by a facial challenge to the ordinance, but in most cases must seek a variance if that relief is available and then exhaust other administrative and judicial remedies.  The facial challenge may be through an action for declaratory relief [citation].  The latter, an 'as applied' challenge to the development restrictions imposed by the administrative agency, may be properly made in a petition for writ of 'administrative' mandamus to review the final administrative decision (Code Civ. Proc., § 1094.5) and that action may be joined with one for inverse

19

condemnation. A declaratory relief action also may be joined with an action in inverse condemnation. [Citation.] Damages for the 'taking' may be sought in an administrative mandamus action (Code Civ. Proc., § 1095), or, if the plaintiff seeks a jury trial, in the joined inverse condemnation action. [Citations.] The owner 'may not, however, elect to sue in inverse condemnation and thereby transmute an excessive use of the police power into a lawful taking for which compensation in eminent domain must be paid.' [Citation.] Compensation must be paid for a permanent taking only if there has been a final judicial determination that application of the ordinance or regulation to the property is statutorily permissible and constitutes a compensable taking. Even then the state or local entity has the option of rescinding its action in order to avoid paying compensation for a permanent taking." (*Hensler*, *supra,* 8 Cal.4th at pp. 13-14.)

As the Court of Appeal explained in *Patrick Media Group, Inc. v. California Coastal Com.* (1992) 9 Cal.App.4th 592, 608 (*Patrick Media*), "the essential underpinning of the challenge is the invalidity of the administrative action. The gravamen of a challenge based upon inverse condemnation is that the administrative action was invalid *insofar as it did not provide for payment of compensation*. [Citation.]" (*See* also *Mola Development Corp. v. City of Seal Beach* (1997) 57 Cal.App.4th 405, 414 (*Mola*) ["*Hensler* made this point clear. The court required a 'prepayment judicial *determination*' that a regulation is excessive and constitutes a taking in order to give a city the opportunity to change its mind before being compelled to pay damages"].)

2. *Petition for Writ of Administrative Mandate*

Here, Jefferson joined its inverse condemnation causes of action with a petition for writ of mandate, which was ruled upon first by the trial court and denied. Accordingly, we consider first Jefferson's contention the trial court erred by denying its petition for writ of mandamus.[2]

2        For the first time on appeal, the City contends Jefferson has not exhausted its administrative remedies in that it cannot satisfy the ripeness requirement. The City's

20

"Judicial review of most public agency decisions is obtained by a proceeding for a writ of ordinary [Code of Civil Procedure section 1085] or administrative [Code of Civil Procedure section 1094.5] mandate. [Citations.] The applicable type of mandate is determined by the nature of the administrative action or decision. [Citation.]" (*McGill v. Regents of the University of California* (1996) 44 Cal.App.4th 1776, 1785.) Typically, quasi-legislative or ministerial acts are reviewed by ordinary mandate, and quasi-judicial acts are reviewed by administrative mandate. (*Ibid.*)

Although Jefferson did not specify below (or on appeal) which type of mandate it sought, the trial court's statement of decision on the writ of mandate indicated it applied the standards for administrative mandamus. Generally "[t]he grant of a land use permit . . . is an adjudicatory act. A proceeding under Code of Civil Procedure section 1094.5 is the exclusive remedy for judicial review of the . . . administrative action of local level agencies in these circumstances. [Citations.]" (*Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1211.)

---

argument is made in passing only and consists of three short sentences found in the conclusion of its response to a different argument. The City states that because Jefferson never submitted a site plan for a 17-acre project, it failed to obtain a final decision as to "'the type and intensity of development legally permitted'" which "renders the entire lawsuit unripe." The argument is devoid of any reasoned legal analysis. Although a jurisdictional issue, such as ripeness, may be raised for the first time on appeal (see *Environmental Defense Project of Sierra County v. County of Sierra* (2008) 158 Cal.App.4th 877, 885; *Farm Sanctuary, Inc. v. Department of Food & Agriculture* (1998) 63 Cal.App.4th 495, 501, fn. 5), it is not an appellate court's job to develop arguments for the parties. In view of the City's failure to present any reasoned legal analysis of the point, we deem the contention waived. (See *Badie v. Bank of America* (1994) 67 Cal.App.4th 779, 784-785 [appellant must present relevant legal authority and reasoned argument on each point made]; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546 [it is not the proper function of Court of Appeal to search the record on behalf of appellants or to serve as "backup appellate counsel"]; *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [appellate court not required to consider points not supported by citation to authorities or record].)

The trial court's inquiry in administrative mandamus "'extend[s] to the questions whether the [agency] has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.' (Code Civ. Proc., § 1094.5, subd. (b).)  Abuse of discretion is established if the [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.  (Code Civ. Proc., § 1094.5, subd. (b).)" (*Kifle-Thompson v. State Bd. of Chiropractic Examiners* (2012) 208 Cal.App.4th 518, 523.)  On appeal, we do not "undertak[e] a review of the trial court's findings or conclusions.  Instead, 'we review the matter without reference to the trial court's actions.  In mandamus actions, the trial court and appellate court perform the same function. . . .' [Citations.]" (*Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1393.)

As explained above, "the essential underpinning of the challenge is the invalidity of the administrative action.  The gravamen of a challenge based upon inverse condemnation is that the administrative action was invalid *insofar as it did not provide for payment of compensation.*  [Citation.]" (*Patrick Media, supra,* 9 Cal.App.4th at p. 608.)

Jefferson contends the conditions imposed on approval of the PMP prohibiting indefinitely the development of the Alternative 1 Acreage and the Temporary No-Build Area—11 acres,[3] which is over one-third of its property—to preserve that

---

[3]  At oral argument the City suggested nine acres was the combined total of the Alternative 1 Acreage and the Temporary No-Build Area, but in their briefs both parties represent nine acres was the amount of property needed for the Alternative 1 alignment for the Interchange Project, and the Temporary No-Build Area was an *additional* approximately two acres.  Thus, for our purposes here, we will refer to the Alternative 1 Acreage and the Temporary No-Build Area, as having a combined total of approximately 11 acres.  We note, however, the designated Temporary No-Build Area, likely had little if any practical impact on the size of Jefferson's project as it was designated by Jefferson from the outset as an unbuildable drainage retention basin.

22

property for possible future rights-of-way for the Interchange Project was an invalid taking. We agree. As Jefferson points out, the PMP fully satisfied all the City's requirements for development of the Property. The only findings contained in Ordinance No. 1151 approving the PMP were that the PMP was consistent with the City's general plan, the applicable specific plan, and complied with the City's zoning ordinances. There is nothing in the record suggesting Jefferson's project caused or contributed to the need for the Interchange Project—as City staff consistently observed, the Interchange Project was needed to accommodate and promote regional growth and was viewed by the City "not as an interchange, but as our economic development opportunity, because it is a major interchange."

The City's primary rationale for removing 11 acres from the otherwise developable site was that it planned to acquire all or some of the development-restricted property for construction of the Interchange Project and if development of that property was permitted, the City could incur additional costs for the buildings and relocation of tenants. Moreover, whether the Interchange Project ultimately would be built, and its precise location, was still not decided. As the city manager observed in 2007, the I-10 interchanges had been funded and defunded due to state budget problems. The City would not have funds for rights-of-way acquisition until all state and federal environmental reviews were completed—a process that *might* be completed in a few years. The final configuration of the Interchange Project was not known—Caltrans might not accept the City's recommendation for Alternative 1.

"The principles which affect the parties' rights in an inverse condemnation suit are the same as those in an eminent domain action. [Citations.]" (*Breidert v. Southern Pac. Co.* (1964) 61 Cal.2d 659, 663, fn. 1.) As this court observed in *Chhour v. Community Redevelopment Agency* (1996) 46 Cal.App.4th 273, 279-280, "'[I]t is well established that condemnation and inverse condemnation are merely different forms of the same limitation on governmental power. [Citations.]' [Citation.] Principles

23

applicable to eminent domain proceedings apply, where appropriate, to suits in inverse condemnation. [Citations.]" (See also *People ex rel. Dept. of Transportation v. Diversified Properties Co. III* (1993) 14 Cal.App.4th 429, 441, fn. 3 (*Diversified Properties*) [distinction between direct condemnation and inverse condemnation of no significance "[i]nsofar as the constitutional mandate of just compensation is concerned].) Therefore, we find guidance from both direct and inverse condemnation cases.

In a direct condemnation action, a de facto taking occurs when there was a "'physical invasion or direct legal restraint'" prior to the statutory valuation date in which case the property is valued as of that date. (*Klopping v. City of Whittier* (1972) 8 Cal.3d 39, 46 (*Klopping*).)[4] *Diversified Properties, supra,* 14 Cal.App.4th 429, a direct condemnation case, considered a de facto taking claim in factual circumstances similar to those in this case. In *Diversified Properties,* a developer bought a 17.38-acre parcel in the City of Rancho Cucamonga intending to build a commercial shopping center on the property. While escrow was still open, the developer learned a three-acre portion of the property was designated by the state for potential freeway rights-of-way. The developer closed escrow after being advised by the state that if development was imminent, and there was confirmation from the city that but for the need to protect the state's proposed rights-of way, development of the property would be approved, the state would be able to purchase the rights-of way. (*Id.* at pp. 437-438.) The developer submitted development

_____

[4] In *Klopping*, the Supreme Court differentiated claims for precondemnation damages from claims for a de facto taking, explaining precondemnation damages result when a public entity engages in precondemnation conduct short of a de facto taking causing adverse economic impact to private property resulting from precondemnation delay and/or unreasonable conduct. (*Klopping, supra,* 8 Cal.3d at pp. 51-52.) "[W]hen the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our constitutional concern over property rights requires that the owner be compensated. This requirement applies even though the activities which give rise to such damages may be significantly less than those which would constitute a de facto taking of the property. . . . " (*Ibid.*)

plans to the city, which, as required by the city, excluded from the otherwise developable area the three-acre proposed for freeway rights-of-way plus an additional one and one-half acres potentially needed for a reconstruction of the freeway interchange. (*Id.* at p. 438.) Then, in April 1986, the city formally requested the state "exercise its protective acquisition' authority" to purchase "the four and one-half acres 'set aside' from [the developer's] larger parcel[,]" property which otherwise would have been developable. (*Id.* at p. 439.) After a year, the state had still not initiated condemnation proceedings leaving the four and one-half acres undevelopable. Another year and a half passed before the state finally made an offer to purchase the property, which the developer rejected. (*Id.* at p. 439.) The developer filed an inverse condemnation action against the state, which it ultimately agreed to dismiss when the state filed its direct condemnation action. The trial court ruled there had been a de facto taking of the developer's property by the state due to the direct interference with its right to develop its property. (*Id.* at pp. 439-440.)

In affirming the trial court's de facto taking ruling, the *Diversified Properties* court began with the rule that "governmental regulation of the development of land rises to the level of a 'taking' if it 'denies an owner economically viable use of his land.' [Citation.]" (*Diversified Properties, supra,* 14 Cal.App.4th at p. 441, fn. omitted, quoting *Agins v. Tiburon* (1980) 447 U.S. 255, 260; see *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1015, 1019.) The court concluded the state, as the condemning agency, was liable for the de facto taking that occurred long before the direct condemnation action was filed because the development restrictions imposed by the city precluded the property owner from realizing any economic value from the subject

property (the four and one-half acres of the property owner's 17.385-acre parcel)[5] and the state had a direct hand in causing those development restrictions: "(1) The [c]ity and the [s]tate 'cooperated' with each other with respect to the nondevelopment of [the subject] property within and along the [s]tate's proposed freeway route . . . ; (2) the [s]tate knew that the [c]ity had deprived [the property owner] of virtually all right to develop the subject property and that this development restriction rendered the subject property virtually unmarketable; (3) the [s]tate knew that *the [c]ity's restrictions on the development of the subject property were based solely on the fact that the property was located within the proposed freeway route*; and (4) the [s]tate had no intention of actually condemning the subject property for many years (although it was arguably willing to buy the property at an earlier date if an agreeable purchase price could be negotiated)." (*Id.* at p. 442, fn. omitted, italics added.) Despite the fact the subject property was otherwise developable and "it would still be several more years before the [s]tate needed to need to condemn the subject property for freeway construction . . . the [s]tate merely 'sat back' and allowed the [c]ity, by way of its development restrictions, to 'bank' the subject property for the [s]tate—presumably so that the [s]tate could, at a later date, condemn the subject property in an undeveloped (and, consequently, less costly) condition." (*Id.* at p. 443.)

*Diversified Properties* relied on *Jones v. People ex rel. Dept. of Transportation* (1978) 22 Cal.3d 144, 151 (*Jones*), an inverse condemnation case in which a taking was similarly found based on the prohibition of development of property solely to preserve it for future acquisition for public use. In *Jones*, "'plaintiffs bought

---

5       The *Diversified Properties* court was not persuaded by the fact that development restriction did not apply to *all* the property: "While it is true that not all of [the property owner's] *larger* parcel was 'taken' by the [s]tate, it is also true that all of the subject parcel *was* 'taken' by the [s]tate and it is the inverse condemnation of the subject parcel that we are here concerned with." (*Diversified Properties, supra,* 14 Cal.App.4th at p. 444, fn. 6.)

26

property with frontage on Fair Oaks Boulevard, intending to subdivide, with access from the boulevard to the subdivision. The [state] announced plans to construct a freeway which would cross plaintiffs' property and cut off access from Fair Oaks Boulevard. Pursuant to provisions of the Streets and Highway Code, the [state] entered into a freeway agreement with the county to reroute or close streets which would intersect with the freeway, and further providing that no road could be opened into or connected with a freeway without permission of the state . . . . The county refused to approve plaintiffs' subdivision map because of the state's freeway requirements. [¶] The Supreme Court held that plaintiffs were entitled to recover damages against the state because its actions substantially impaired their access. [Citation.]" (*Diversified Properties, supra,* 14 Cal.App.4th at pp. 442-443.)

In finding compensation was required for denying access to—and hence the ability to develop—the property, *Jones* observed, "if the only acts of which plaintiffs complain were the adoption of the route, the designation of their land for future acquisition, and the purchase of some of the properties along the right of way, there would be no such direct and special interference with plaintiffs' rights as to justify an action in inverse condemnation. [P]lanning and construction of a freeway requires a substantial period of time, and a holding that announcement of the plan for the freeway results in inverse condemnation of properties designated for ultimate acquisition would result in the forced purchase by the state of large amounts of property which might never be used and would severely hamper the government's ability to make needed improvements in the highway system. The need for flexibility in planning, changing the design of, or even abandoning a proposal for a highway militates against the theory that an action for inverse condemnation lies for the general effects of such conduct. [¶] Here, however, the state went further. It effectively denied plaintiffs the right to subdivide their land by depriving them of the access required for subdivision. Although it was the county which refused to approve plaintiffs' subdivision map providing for access from

Fair Oaks Boulevard, the reason given for the refusal was the freeway agreement with the state and the provision of section 100.2 of the Streets and Highways Code that no road could be opened into a freeway without permission of the [state]." (*Jones, supra,* 22 Cal.3d at p. 152.) In other words, once the state's expressed desire to acquire the plaintiffs' property in the future resulted in denial of land use approvals, a taking occurred. (See *Taper v. City of Long Beach* (1982) 129 Cal.App.3d 590, 614-615 [finding of de facto taking supported by evidence city rejected property owner's development application because city intended to acquire property for public park]; see also *Simpson v. City of North Platte* (Neb. 1980) 292 N.W.2d 297, 301 [requiring developer to dedicate land for future unscheduled public use unrelated to burdens imposed by developer's project nothing more than "a 'land banking' operation" in violation of takings clause].)

Here, as in *Diversified Properties*, the City conditioned approval of development upon the Alternative 1 Acreage and Temporary No-Build Area remaining undeveloped to preserve that acreage for future acquisition for public use. At public hearings, the City staff repeatedly stated the City should not allow development on the property so as to avoid additional costs (e.g., for relocation of tenants and demolition of buildings) at such time as it was ready to acquire the property. We agree with Jefferson the conditions were imposed to "'bank'" the otherwise developable property so it could potentially be condemned at some unknown time in the future "in an undeveloped (and, consequently, less costly) condition." (*Diversified Properties, supra,* 14 Cal.App.4th at p. 443.) And applying the reasoning of *Diversified Properties,* the condition effected an uncompensated taking of the Alternative 1 Acreage and the Temporary No-Build Area, and therefore, the trial court erred by denying Jefferson's petition for writ of mandate.

The City contends prohibiting development on the Alternative 1 Acreage was not a taking because the condition did not deprive Jefferson all use of its property—

28

Jefferson received approval to proceed with development of the remaining 17 acres. Thus, it argues Jefferson has not been denied all beneficial use of its land.

We are not unmindful that "'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, [courts] focus[] rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole . . . ." (*Penn Central*, *supra,* 438 U.S. at pp. 130-131.) But in this case, it is the City that has divided the Property into discrete segments.

It is without dispute that under all applicable land use regulations, Jefferson's entire property was developable and the PMP it submitted was in full compliance with those regulations. The City precluded Jefferson from building on a substantial portion of the Property so as to preserve it in an undeveloped state for possible future acquisition by the City for the Interchange Project. It would exalt form over substance to conclude because some of the Property could be built upon, there was no taking of the remainder declared undevelopable. Here Jefferson has been denied all beneficial use of the Alternative 1 Acreage and the Temporary No-Build Area on which no development is permitted, just as in *Diversified Properties* where the city prohibited development on the four and one-half acres of the developer's 17-acre property the state identified as needed for freeway. (*Diversified Properties, supra,* 14 Cal.App.4th at p. 444, fn. 6.) Thus this case is analogous to *Twain Harte Associates, Ltd. v. County of Tuolumne* (1990) 217 Cal.App.3d 71, 77-79, in which the county carved out 1.7 acres from the property owner's 8.5-acre lot zoned light commercial, and rezoned it as open space, effectively preventing any development thereon. The county argued that for taking purposes the 1.7-acre plot must be considered within the entire 8.5-acre parcel, 6.8 acres of which had already been developed with a shopping center. The court held

whether there was a taking of the 1.7 acres was not dependent on the treatment of the entire parcel as a whole. (*Id.* at p. 87.)

The City also contends prohibiting development of the Alternative 1 Acreage and the Temporary No-Build Area was appropriate because the City was barred by federal law from acquiring the necessary rights-of-way until all environmental reviews were complete and the final configuration of the Interchange Project was approved. The City cites *Lathan v. Brinegar* (9th Cir. 1974) 506 F.2d 677, and *Lathan v. Volpe* (9th Cir. 1971) 455 F.2d 1111, and those opinions' discussions of the complex procedures involved in construction of federally funded highways and at what stage in the process rights-of way can be bought. We find little relevance to that argument as the issue before us is whether the City improperly denied Jefferson's application for development of the property so as to keep it undeveloped (and thus less costly) for that future acquisition if and when it occurs.

In sum, we conclude here that the conditions imposed by the City in approving the PMP were invalid because they constituted an uncompensated de facto taking of the Alternative 1 Acreage and the Temporary No-Build Area. Therefore, the trial court should have granted Jefferson's petition for writ of mandamus.[6]

We cannot, however, agree with Jefferson's assertion the conditions effected a taking of its *entire* 26.85-acre property. Jefferson describes the conditions as creating a completely unidentifiable "floating no-build" area affecting its entire property rendering "*any* development on *any* portion [or the property] . . . ephemeral and impossible." To the contrary, the area on which development was restricted, i.e., the Alternative 1 Acreage, was delineated on various Caltrans-generated schematics. Those

---

[6]     In view of this conclusion, the trial court erred by granting the City's motion for judgment on the pleadings on the remaining inverse condemnation causes of action given that the sole basis for granting the motion was Jefferson's failure to prevail on the mandamus cause of action.

schematics showed the footprint of each alternative for the Interchange Project. The City initially expressed a preference for the Alternative 3 configuration and Jefferson's PMP included an appendix demonstrating the impact of that alternative on its project and submitted revised site plan showing how the project could be reconfigured if Alternative 3 was selected. Jefferson, however, advocated for the selection of Alternative 1 because it was the configuration that would be least disruptive to its project, and the City selected Alternative 1 as the preferred configuration. At the final planning commission hearing on the PMP, Jefferson's project planner discussed how the project might be modified to accommodate the Alternative 1 configuration, and Ellis indicated Jefferson would reluctantly modify the PMP to accommodate the Alternative 1 configuration so long as Jefferson was going to be compensated for the acreage excluded from the PMP. There was no suggestion Jefferson did not understand what acreage the City was excluding from development—it was the acreage shown on the schematics as the Alternative 1 configuration.

Similarly, the Temporary No-Build Area was identified in the ordinance approving the PMP as 2.1 acres on the southeastern portion of the site—a location that corresponds to the unbuildable drainage retention basin area designated in the PMP. The City then conditioned approval of the PMP upon Jefferson revising the building envelope for the project to conform to the Alternative 1 configuration (i.e., no development on the Alternative 1 Acreage). Although it is true that at the time the PMP was approved, the City would not have known the precise description of the land that would ultimately be taken for the Interchange Project, what is at issue here is the property that it excluded from Jefferson's development application. Jefferson cannot claim it did not know what property that was.

Having concluded the conditions imposed by the City in approving the PMP were invalid because they effected an uncompensated taking of the Alternative 1 Acreage and the Temporary No-Build Area, and the trial court should have granted

31

Jefferson's petition for writ of mandamus, we must turn to the appellate remedy. That requires us to turn back to *Hensler, supra,* 8 Cal.4th 1, and face the elephant in the room: the pending County Condemnation Action.

*Hensler, supra,* 8 Cal.4th 1, 14, requires a property owner alleging that government action constitutes an uncompensated taking must first challenge the development restriction by way of a writ of mandate so as to prevent the property owner from unilaterally "transmut[ing] an excessive use of the police power into a lawful taking for which compensation in eminent domain must be paid.' [Citation.] Compensation must be paid for a permanent taking only if there has been a final judicial determination that application of the ordinance or regulation to the property is statutorily permissible and constitutes a compensable taking. Even then the state or local entity has the option of rescinding its action in order to avoid paying compensation for a permanent taking." In other words, a prepayment judicial determination that the development restriction constitutes a taking is required "in order to give a city the opportunity to change its mind before being compelled to pay damages." (*Mola, supra,* 57 Cal.App.4th at p. 414.) In this case that would mean the City must either approve Jefferson's PMP without the conditions precluding development on the Alternative 1 Acreage and the Temporary No-Build Area, or it must pay compensation for the taking. But the County Condemnation Action has effectively taken the former option off the table, leaving only the issue of determining just compensation for the Alternative 1 Acreage and the Temporary No-Build Area.

As noted above, we have taken judicial notice of the December 28, 2011, Cooperative Agreement between the City, Caltrans, and the County pursuant to which the County has become the responsible agency for construction of the Interchange Project, and has assumed all responsibility for acquisition of rights-of-way for the Interchange Project "including all eminent domain activities." We have also taken judicial notice of the eminent domain complaint filed by the County in February 2014 in the County

32

Condemnation Action and additional documents filed by Jefferson in the County Condemnation action including: (1) its motion to file an amended answer in which it indicates it will be seeking damages for the same precondemnation conduct that underlie this writ of mandate/inverse condemnation action; and (2) its motion to consolidate the County Condemnation Action with the City Condemnation Action by which the City is acquiring an additional part of Jefferson's property for improvement of the Jefferson Street/Varner Road intersection. Jefferson has previously stipulated in this court that it does not challenge the County's or the City's right to take and the issues pending resolution in those actions relate to just compensation for the taking.

We invited the parties to file supplemental letter briefs addressing the effect of the County Condemnation Action on the present case. The City argues the County Condemnation Action renders the present appeal moot because Jefferson will now obtain just compensation in the direct condemnation action. It contends that if this appeal is not dismissed as moot, Jefferson will pursue duplicative damages against the City and the County for the same property taken, severance damages to the remainder, damages for delay in instituting a direct condemnation action, and "attorneys fees, and the like."

"'It is well settled that an appellate court will decide only actual controversies and that a live appeal may be rendered moot by events occurring after the notice of appeal was filed. We will not render opinions on moot questions or abstract propositions, or declare principles of law which cannot affect the matter at issue on appeal. [Citation.]'" (*Indio Police Command Unit Association v. City of Indio* (2014) 230 Cal.App.4th 521, 538; *People v. Gregerson* (2011) 202 Cal.App.4th 306, 321 ["'"[A] case becomes moot when court ruling can have no practical effect or cannot provide the parties with effective relief"'"].)

We do not agree with the City that the County's institution of a direct condemnation action renders this action moot. Condemnation actions can be abandoned in whole or in part "any time after the filing of the complaint and before the expiration of

33

30 days after final judgment . . . ."  (Code Civ. Proc., § 1268.510, subd. (a).)
*Red Mountain, LLC v. Fallbrook Public Utility Dist*. (2006) 143 Cal.App.4th 333, 356
(*Red Mountain*), applying the rules set forth in *Klopping*, *supra,* 8 Cal.3d 39, explains
"that as between a[n] . . . eminent domain action and an inverse condemnation action
involving the same property, the case that proceeds to judgment first is res judicata *as to*
*issues common to both actions* and bars recovery in the other action of any damages that
were or could have been recovered in the action that proceeded to judgment first.
[Citation.]"  And it is not clear the County Condemnation Action encompasses *all* of the
Alternative 1 Acreage, which the City prohibited Jefferson from developing.

　　　　Moreover, any concerns about double recovery may appropriately be
handled and avoided by consolidating this case with the County Condemnation Action
cases on remand.  (Code Civ. Proc., § 1048, subd. (a) [consolidation of actions pending in
same court that involve common questions of law or fact ]; see *Red Mountain, supra,*
143 Cal.App.4th at p. 357 [inverse condemnation action and eminent domain action
consolidated and proceeded to judgment together].)  Indeed, consolidation appears
particularly appropriate in this case—the cases are in the same court, involve the same
property, and many (if not all) of the same damages.  Although the County is not before
us in this action, it has stepped into the City's shoes to become the responsible agency for
the constructing Interchange Project responsible for all eminent domain activities—which
as a practical matter limits the City's options on remand—and Jefferson has already
sought consolidation of the County Condemnation and the City Condemnation Action
bringing all the parties before the same court in those actions as well.  (See *People ex rel.*
*Department of Public Works v. Chevalier* (1959) 52 Cal.2d 299, 307-308 [trial court
properly consolidated separate eminent domain actions by state and city pertaining to
same freeway project].)

DISPOSITION

The City's request for judicial notice filed February 28, 2013, is granted as to the four-volume administrative record lodged with this court and denied as to Exhibit A, the Indio City Council Agenda Report dated October 20, 2009. The City's request for judicial notice filed October 27, 2014, is granted. The City's request for judicial notice filed March 6, 2015, is denied.

The trial court's judgment is reversed and the matter is remanded to the trial court with directions to grant appellant's petition for writ of mandate and conduct further proceedings in accordance with this opinion to determine just compensation for the Alternative 1 Acreage and the Temporary No-Build Area, which proceedings should include considering consolidation of this action with the pending County Condemnation Action (Riverside County Super. Ct., Case No. PSC1400798) and the pending City Condemnation Action (Riverside County Super. Ct., Case No. PSC1400896). Appellant is awarded its costs on this appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


FYBEL, J.

35

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JEFFERSON STREET VENTURES, LLC, | |
| Plaintiff and Appellant, | G049899 |
| v. | (Super. Ct. No. INC072101) |
| CITY OF INDIO, | ORDER GRANTING REQUEST FOR PUBLICATION |
| Defendant and Respondent. | |

The Law Offices of Palmieri, Tyler, Wiener, Wilhelm & Waldron, the Law Offices of Matteoni O'Laughlin & Hechtman, and the Law Offices of Jenny & Jenny have requested that our opinion filed April 21, 2015, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.

O'LEARY, P. J.

WE CONCUR:

BEDSWORTH, J.

FYBEL, J.

36