Filed 5/22/20 Certified for Publication 6/12/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JENNIFER S. LAK, | |
| Respondent, | G056784 |
| v. | (Super. Ct. No. 09D001393) |
| DANIEL K. LAK, | O P I N I O N |
| Appellant, | |
| ORANGE COUNTY DEPARTMENT OF CHILD SUPPORT SERVICES, | |
| Intervener and Respondent. | |

Appeal from an order of the Superior Court of Orange County, Barry S. Michaelson, Temporary Judge (Pursuant to Cal. Const., art. VI, § 21.) Affirmed.

Daniel K. Lak, in pro. per., for Appellant.

Xavier Becerra, Attorney General, Cheryl L. Feiner, Senior Assistant Attorney General, Linda M. Gonzalez and Ricardo Enriquez, Deputy Attorneys General for Intervener and Respondent.

1

Since 2015, the Orange County Department of Child Support Services (the Department) has withdrawn money from Daniel Lak's (Father) Social Security Disability Insurance benefits (SSDI) to pay for child/spousal support arrears. Because Father disputed the Department's authority to withdraw money, it sought clarification from the trial court. At the hearing, Father sought reimbursement for overpayments and maintained the Department violated Family Code section 5246, subdivision (d)(3) (section 5246(d)(3)), by collecting more than five percent from his SSDI (five percent rule).[1] Father also requested the court impose sanctions against the Department for its "improper collection activities." The court denied Father's requests and determined the Department could continue withdrawing money from SSDI for support arrears.

On appeal, Father maintains the court misinterpreted the law and failed to properly consider his motion for sanctions. Finding his contentions lack merit, we affirm the court's order that the Department did not overdraw money for arrears, Father failed to demonstrate he qualified for section 5246(d)(3)'s five percent rule, and sanctions were not warranted.

FACTS

After 18 years of marriage, Father and Jennifer Lak (Mother) entered into a stipulated judgment of dissolution. They agreed Father would pay $2,000 per month in child support and $750 per month in spousal support. (*In re Marriage of Lak* (June 18, 2014, G048304) [nonpub. opn.] (*Lak*).) The trial court entered the final judgment in April 2011. (*Lak, supra,* G048304.)

I. *Contempt Order*

On June 5, 2015, Daniel admitted to six counts of contempt for his failure to pay support in 2013 and 2014. Pursuant to a plea agreement, the trial court sentenced

---

[1] All further statutory references are to the Family Code, unless otherwise indicated.

2

Father to serve 30 days in jail, but suspended the sentence and placed Father on probation for three years.

The court imposed several probation conditions, including that Father pay $1,601 per month for child support plus $49 per month towards arrears for a total of $1,650 per month starting on July 1, 2015. The contempt order contained a checked box next to the following preprinted statement: "This contempt order does not operate to modify the amount of child support [Father] owes, including any accrued arrears, nor does it limit enforcement remedies."

II. *Disability Benefits*

The same month as the court issued the contempt order (June 2015), Father began collecting SSDI ($2,234 per month). The Department immediately started withdrawing $1,116 from Father's SSDI (approximately 50 percent) to pay Mother for support arrearages.

The record contains very little information about the reason why Father qualified for SSDI benefits other than Father's unverified story in his legal memorandum. Suffice it to say, Father claimed he qualified for SSDI because in April 2015 he was hospitalized and diagnosed with depression, anxiety, and post traumatic stress disorder (PTSD). Father explained his mental state deteriorated after he became homeless and needed to rely on food stamps to survive. His misfortunes began when he lost the ability to practice law (disciplinary suspension in August 2014, and disbarment in November 2015). After running out of personal property to sell, Father was evicted from his rental home and temporarily lived in his car until it was repossessed. He maintained he was currently living with his aunt and benefitting from therapy.

III. *Father's Motion to Modify Child/Spousal Support*

Father maintained the Department continued withdrawing $1,116 for the months of July through September 2015, but collected $4,834 in October 2015. In early

3

November, Father filed a motion to modify child/spousal support, which was heard the following year in February 2016.

While the motion was pending, Father asserted the Department withdrew various sums in November, December, January, February, and March ($1,600, $2,233, $2,233, $2,233, and $709 respectively).  Starting in April 2016, the Department reduced the amount it was collecting each month to $375 for arrearages.

The Department's reduction was in response to the court's ruling at the February 2016 hearing.  The court modified child support downward from $2,000 to $836 per month, and reduced spousal support to $0, effective December 1, 2015.  With respect to arrearages, the court made the following orders:  (1) "Father to be given credit for $280[] per month in derivative benefits[;]" (2) "Court orders payment on undetermined arrears at $375[] per month" starting in March 2016; (3) "[The Department] is ordered to prepare an Arrears Audit and to serve it on the parties."  The preprinted order cautioned, "No provision of this judgment can operate to limit any right to collect all sums owing in this matter as otherwise provided by law."

IV. *Derivative Benefits & Father's Motion for Sanctions*

The following month (March 2016), Mother began receiving Social Security derivative benefits of $1,116 per month because of Father's qualification for SSDI benefits.  The Family Code provides Father must receive a credit for the derivative benefit against his child support obligation.  (§ 4504, subd. (b).)  And in this case, the $1,116 more than covered Father's $836 monthly support obligation.

Father and the Department became embroiled in a dispute over whether the derivative benefits should also be credited against the court-ordered $375 monthly arrears payment.  The Department maintained the court intended the $375 payment to be in addition to the derivative benefit amount credited towards support and arrears.  The Department refused to stop withdrawing $375 each month from Father's SSDI.

4

Because of this dispute and the Department's failure to serve its Arrears Audit, Father filed a motion to compel and requested sanctions for the Department's purported bad faith litigation tactics. The court's June 5, 2017, minute order indicates it denied sanctions on the grounds that Father's statutory authority regarding discovery abuse did not apply and the Department had not delayed the matter in bad faith. The order also reflected the Department gave Mother and Father an Audit Report dated June 1, 2017.

Additionally, the court noted there was a hearing scheduled later that month to correct/clarify the original 2010 support order. It continued the matter to July 2017, and ordered the parties to meet and confer before then and together make a "list of all disputed debts and credits."

V. *Determination of Arrearages*

At the July 2017 hearing to clarify the original 2010 support order (which is not at issue in this appeal), the court also addressed the issue of how much Father owed in arrears. First, it determined the Department's "Simple Report" given to the parties at the last hearing was "the equivalent of the '[A]rrears [A]udit' ordered to be provided to the parties in the [February 1, 2016] order."

Second, the court modified the portion of the February 2016 order indicating Father would receive a $280 per month credit for derivative benefits "to reflect that Father is to be given a credit for all derivative benefits received by the children." It noted the Arrears Audit "accurately reflect[ed] all derivative payments received by the children through" May 31, 2017.

Third, the court determined the audit showed the support charged and payments received were accurate through May 31, 2017 (with one exception not relevant to this appeal). It calculated child support arrearages totaled $102,851.61, spousal support arrearages totaled $60,750.80, for a total of $163,602.41.

5

VI. *The Department's Motion for Clarification*

Five months later, the Department filed a motion seeking clarification of the arrears order because the parties disagreed about whether the Department could collect $375 each month from Father's SSDI, or if the court's order was satisfied by derivative benefit credits.

At a hearing held in January 2018, the court read aloud its tentative ruling, which was included in the minute order. The court ruled, "[It] does not have the authority to order, and did not state in the order of February 1, 2016, that there should be any collection from [Father's] disability." The court asked the parties to prepare additional briefing on several issues, including whether reimbursement was permissible, and application of section 5346(d)(3)'s five percent rule. It continued the matter to March. The court indicated these issues as well as Father's request for sanctions would be considered together at the March hearing.

Father filed supplemental briefing complaining the Department collected more than what was legally permitted for over two years. He argued the Department's actions caused him to stop being an integral part of his children's lives because he could have used the wrongfully collected $29,000 to rent housing and regain joint physical custody of his children. He maintained the children did not understand why their father stopped being a part of their lives.

Father offered a specific example of the Department's miscalculations. For June 2016, the original support payment plus arrears was $1,211 (with each of his children receiving a specific portion of that sum). In June 2016, one of his children graduated from high school and the support payment dropped from $835 to $526. Therefore, he owed $901 per month ($526 for support plus $375 arrears). Also in June, Wife received $1,116 from SSDI derivative benefits and the Department collected $375 from Father's SSDI (a total combined credit of $1,491). Father concluded the Department should have stopped collecting money from his SSDI benefits because

6

Wife's $1,116 derivative benefits were more than enough to cover what he owed for support and arrearages ($901).

In addition, Father maintained section 5246(d)(3), precluded the Department from withholding more than five percent of his monthly SSDI payment ($2,234). The Department was taking $375, while five percent would be only $111.70. Father requested a refund of this overpayment in addition to 10 percent interest.

In its response, the Department argued Father failed to provide authority to support his contention the money must be refunded. In addition, it maintained section 5247 precluded sanctions against the Department. Finally, the Department asserted it was authorized to withhold up to 50 percent of Father's SSDI's benefits for child support, but the Department took only $375 to comply with the court's February 2016 arrears order. The Department maintained section 5246(d)(3)'s five percent rule did not apply to Father, who currently owed over $160,000 in arrears.

Father filed a "pretrial statement" that repeated his claim the Department overcharged him. He provided additional legal analysis on the issue of whether the five percent rule applied. Father asserted SSDI benefits should not qualify as ordinary income because he was disabled and he owned less than $2,000 in assets. Father claimed the Department had proof of his SSDI eligibility.

VII. *The Court's Final Ruling*

At the March 23, 2018, hearing, the court stated it would not consider Father's untimely filed pretrial statement. The court considered argument from both parties, most of which centered on whether Father met his burden of proof with respect to section 5246(d)(3)'s five percent rule.

The court made the following rulings: (1) It lacked authority to refund money the Department collected from Father's SSDI benefits and had been distributed to Mother; (2) Mother must be given the money the Department collected but had not yet distributed; (3) the Department had authority to take $375 from Father's SSDI benefits;

7

(4) section 5246(d)(3)'s five percent rule did not apply because Father "failed to produce evidence of providing proof of his eligibility to [the Department];" (5) Father's income and expense declaration and his written declaration were insufficient to show he provided proof of eligibility to the Department; (6) sanctions were unwarranted because there was not "any evidence of any act or omission by [the Department] which would result in sanctions being considered or ordered[;]" (7) the February 2016 order was corrected to reflect Father must receive credit for all derivative benefits; and (8) the June 2015 order that Father pay $49 in arrears was a condition of probation, not a support order.

On June 29, 2018, the Department and Father each submitted proposed orders. The court adopted the Department's order.

## DISCUSSION

Father offers several different legal theories for why the Department wrongfully withdrew money from his SSDI. Because the theories change depending on the time period, we will begin our analysis in chronological order.

I. *SSDI Withdrawals From June to December 2015*

During these seven months, Father maintained the Department withdrew various sums from his SSDI (ranging from $708 to $4,834 per month). At the same time, the court's contempt order was in effect, requiring Father, among other things, to pay $49 per month towards arrears. Father contends the maximum the Department could withdraw was $49 from his SSDI. He views the contempt order as being the equivalent of a final order modifying support. The Department asserts the court's ruling regarding arrears was merely a probation condition and the Department was authorized to withhold up to 50 percent of Father's SSDI income. (Cal. Code Regs., tit. 22, § 116100(a)(3).)

We begin by addressing the effect of the court's $49 arrears order. As noted by the Department, the order must be viewed in context of the entire ruling. The payment obligation was one of nine probation conditions Father consented to as part of

8

his plea agreement. Father's 30-day jail sentence was suspended on the condition he satisfy the probation conditions for three years.

We conclude an arrears payment as a probation condition does not have the same effect as a final order modifying support. It is well settled the family law court has broad authority to enforce its judgments by contempt. (§ 290.) Each month a party fails to make a child/spousal support payment is punishable as a separate count of contempt. (Code Civ. Proc., § 1218.5, subd. (a).) "Once a civil contemnor complies with the underlying order, however, he or she is purged of the contempt and is free. In that respect, civil contemnors hold the key to the jail cell in their own pocket and can secure their release at any time by following the court's order." (33A Cal. Jur. 3d Family Law § 1421, fns. omitted; *In re Nolan W.* (2009) 45 Cal.4th 1217, 1236-1237.)

Here, Father could avoid spending time in jail every month he paid at least $1,601 child support and $49 for arrears. After three years of complying with his nine probation conditions, Father would be purged of the contempt and free. In other words, the probation condition arrears order was not permanent like a final support order.

Moreover, Father presented no case authority, and we found none, holding a contempt hearing should or could replace the procedures and evidentiary requirements described in sections 3650 to 3693 to modify a final support award. Under those provisions, a party must introduce admissible evidence that demonstrates "changed circumstances to justify a modification." (*In re Marriage of Brinkman* (2003) 111 Cal.App.4th 1281, 1288.) No such evidence was required for the contempt proceedings, and for this additional reason, we conclude a probation condition relating to child support/arrears cannot be deemed a permanent modification of the final support judgment.

Accordingly, the $49 order merely set a minimum payment obligation lasting for three years of Father's probation. Meanwhile, the 2011 support order (a total of $2,750 for child and spousal support) remained in effect. The related question of

9

whether there was a maximum limit for how much the Department could withdraw from SSDI is addressed below.

II. *SSDI Withdrawals From December 2015 to March 2016*

In February 2016, the family law court modified the original support order, concluding Father's disability and inability to work was a change of circumstances justifying a reduction (applied retroactively to when Father filed his motion in December 2015). In addition to changing Father's monthly child and spousal support obligation, the court "order[ed] payment on undetermined arrears" at $375 per month beginning in March 2016.

During the four months Father's motion to modify support was pending, he claims the Department withdrew various sums from his SSDI (ranging from $709 to $2,233 per month). Starting in April, the Department started consistently withdrawing $375 each month. The parties raise several arguments concerning these actions. First, what was the maximum amount the Department could withdraw from Father's SSDI benefits? Second, was the Department limited by section 5246(d)(3)'s five percent rule? Third, what effect, if any, should Mother's derivative benefits have on calculating Father's arrears obligation from SSDI benefits? Fourth, does the court have authority to force the Department to reimburse Father for money collected from SSDI and paid Mother for child support arrears?

A. *Relevant Legal Principles About Maximum Withdrawals*

Before analyzing the above issues, it is helpful to review the laws governing child support collection and clarify the terminology regarding different Social Security benefits.

Section 290 provides any support judgment/order can be enforced "by execution, the appointment of a receiver, or contempt, or by any other order as the court in its discretion determines from time to time to be necessary." One method of enforcement is the assignment of earnings. In addition to judicial earnings assignment

10

orders (§ 5230, subd. (a)), there are alternate procedures in place for Title IV-D cases when a local child support agency (the Department), is providing support enforcement services under section 17400.[2]

Specifically, the Department may serve on an employer a notice of assignment to withhold income for child support. This order has the "same force and effect as an earnings assignment order signed by a judicial officer" and does not require a judicial officer's signature. (§ 5246, subd. (b).) The withholding order may include the current ordered support and arrearages. (Cal. Code Regs., tit. 22, § 116100(a)(1), (2).) If a court has not ordered arrears payments or additional arrears have accrued "the amount withheld . . . shall not exceed 25 percent of the current support order, or when combined with the current support amount, the maximum amount withheld *cannot exceed 50 percent* of the obligor's disposable earnings." (Cal. Code Regs., tit. 22, § 116100(a)(3), italics added.)

This legal authority answers the first question regarding *the maximum* that could be withdrawn from Father's SSDI. If a court has not ordered an arrears payment, the maximum permitted is 25 percent of the support order or 50 percent of the obligor's "disposable earnings" when combined with current support amount (25/50 percent rule).[3]

---

[2] The statutory scheme refers to the Department as a local child support agency. This is because the Social Security Act required each county to establish a local child support agency (§ 17304), which agrees to "carry out the requirements of the Title IV-D state plan for enforcing child, spousal, and medical support, and determining paternity. (§§ 17000[, subd.] (h), 17304.)" (10 Witkin, Summary of Cal. Law (11th ed. 2019) Parent & Child § 511, p. 636.)

[3] "Section 4059 governs calculation of 'net disposable income.' The calculation subtracts nondiscretionary expenses from gross income to reach 'net disposable income.' The subtracted expenses include state and federal taxes, employer deductions for a pension plan, mandatory union dues, and child or spousal support paid under court order. Only these unavoidable parental expenses are included in the formula." (*In re Marriage of C.* (1997) 57 Cal.App.4th 1100, 1105-1106, italics omitted.)

11

Applied to this case, the court's first arrears order took effect in March 2016. Before the order, *the maximum* the Department could withdraw would be 50 percent of Father's SSDI benefits (50 percent of $2,234 equals $1,117). After the March 2016 order, the maximum amount permitted was $375.

B. *Relevant Legal Principles About the Five Percent Rule*

The second question (regarding application of the five percent rule) is more complicated and requires digging deeper into the statutory scheme regarding the Department's authority to collect arrearages and terminology unique to Social Security benefits. Generally speaking, the Department is authorized to collect arrearages from an obligor's employer (§ 5246, subd. (d)(2)), his SSDI benefits (§ 5246(d)(3)), or bank accounts via a levy (§ 17450). The latter two provisions incorporate limitations against arrear collections in cases where the obligor's income comes from SSDI payments and he or she satisfies a four part test demonstrating limited income and assets. (§§ 5246(d)(3), 17450, subd. (c)(2).)

With respect to section 5246(d)(3), the Department's withholding orders for arrears is limited to five percent of the obligor's SSDI. Section 17450 is part of an article added to the Family Code in 2004 titled "Delinquent Child Support Obligations and Financial Institution Data Match" (FIDM), which established a statewide system for obtaining payment of child support arrears by levying on banks accounts of obligors. (Stats. 2004, ch. 806, § 6, p. 6152.) If an obligor meets the four part test, the Department lacks authority to levy on his or her accounts. (§ 17450, subd. (c)(2), hereafter § 17450(c)(2) [exemption from bank levy].)

It is notable that section 5246(d)(3) [limiting SSDI income withholding] and section 17450(c)(2) [bank levies exemption], originate from the same assembly bill. [4] Each provision contains *identical language* regarding the enforcement of delinquent support from a disabled obligor's SSDI benefits if they lack sufficient assets and income. (Legis. Counsel's Dig., Assem. Bill No. 891 (2001-2002 Reg. Sess.)  Simply stated, both provisions contain the exact same four part test.

Section 5246(d)(3), in its entirety provides the following:  "[If] an obligor is disabled, meets the SSI resource test, *and* is receiving Supplemental Security Income/State Supplementary Payments (SSI/SSP) *or*, but for excess income as described in [s]ection 416.1100 et seq. of Part 416 of Title 20 of the Code of Federal Regulations, would be eligible to receive SSI/SSP, pursuant to [s]ection 12200 of the Welfare and Institutions Code, *and* the obligor has supplied the local child support agency with proof of eligibility for *and,* if applicable, receipt of, SSI/SSP or Social Security Disability Insurance benefits, *then* the order/notice to withhold income issued by the local child support agency for the liquidation of the arrearage shall not exceed [five] percent of the

---

[4]  Assembly Bill No. 891 amended section 5246 and Revenue and Taxation Code section 19271 to include the language regarding disabled obligors receiving SSDI benefits.  (Legis. Counsel's Dig., Assem. Bill No. 891 (2001-2002 Reg. Sess.)  In 2004, the Legislature repealed Revenue and Taxation Code section 19271, and replaced it with section 17450.  (Assem. Bill No. 2358 (2003-2004 Reg. Sess.)  Consequently, the same language is now contained in section 5246(d)(3) and section 17450(c)(2).

13

obligor's total monthly Social Security Disability payments under Title II of the Social Security Act."[5] (Italics added.)

Fortunately, this lengthy sentence can be broken down into a fairly simple four part test. However, before discussing each element it is helpful to quickly review the Social Security benefit terminology used extensively in the statute.

1. Social Security Disability Insurance (SSDI) – The Social Security Administration pays these benefits to workers who have earned enough credits but can no longer work due to a disability. (42 U.S.C. § 423, subd. (a); 2 Soc. Sec. Law & Prac. (Feb. 2020) § 14:22.) Because it is an earned benefit based on the disabled person's contributions to Social Security, the monthly payment can be substantial if the disabled person was previously a high wage earner. Moreover, because SSDI is not a means-tested benefit, a person with substantial assets can still qualify for SSDI benefits. (https://www.ssa.gov/pubs/EN-05-10029.pdf; https://www.ssa.gov/redbook/eng/overview-disability.htm.) In short, qualifying for SSDI benefits does not mean an obligor necessarily lacks the income or assets to pay support or arrears.

---

[5] Section 17450(c)(2) provides: "If an obligor is disabled, meets the federal Supplemental Security Income resource test, and is receiving Supplemental Security Income/State Supplementary Payments (SSI/SSP), or, but for excess income as described in [s]ection 416.1100 and following of Part 416 of Title 20 of the Code of Federal Regulations, would be eligible to receive as SSI/SSP, pursuant to [s]ection 12200 of the Welfare and Institutions Code, and the obligor has supplied the local child support agency with proof of his or her eligibility for, and, if applicable, receipt of, SSI/SSP or Social Security Disability Insurance benefits, then the child support delinquency shall not be referred to the department for collection, and, if referred, shall be withdrawn, rescinded, or otherwise recalled from the department by the local child support agency. The department shall not take any collection action, or if the local child support agency has already taken collection action, shall cease collection actions in the case of a disabled obligor when the delinquency is withdrawn, rescinded, or otherwise recalled by the local child support agency . . . ."

2. Supplemental Security Income (SSI) – "The basic purpose underlying the [SSI] program is to assure a minimum level of income for people who are age 65 or over, or who are blind or disabled and who do not have sufficient income and resources to maintain a standard of living at the established federal minimum income level." (20 C.F.R. § 416.110.) In addition to age, blindness, or having a disability, SSI eligibility requires (1) a certain residency or U.S. citizenship status, (2) evidence the person is not a "fugitive fleeing" or in violation of a probation condition or parole, (3) "income within specified limits," and (4) "resources within specified limits." (2 Soc. Sec. Law & Prac. (Feb. 2020) § 18:2.) An unmarried recipient will typically receive SSI benefits of $630 per month. (Welf. & Inst. Code § 12200, subd. (c).) The Department has no authority to collect arrears from an obligor surviving on SSI benefits.

Unlike SSDI, SSI is not an earned benefit based on contributions to Social Security through employment. "[P]ayments are to be made to . . . people who have *income and resources* below specified amounts. This provides objective measurable standards for determining each person's benefits." (20 C.F.R. § 416.110(a), italics added.) As noted below, a person's income is measured differently than his or her "resources."

(a) SSI Income Test: "Income means the receipt by an individual of any property or service which he can apply, either directly or by sale or conversion, to meeting his basic needs." (20 C.F.R. § 416.120(c)(2).) "[T]he amount of income . . . is a major factor in deciding [eligibility] for SSI benefits and the amount of [a person's benefit]." (20 C.F.R. § 416.1100.) The more income a person has, the less the benefit will be. Not all income is considered to determine eligibility (see 20 C.F.R. § 416.1100-§ 416.1104 [defining what is counted as income]). The income limit is based on the federal benefit rate (FBR). In 2019, the FBR was $771 per month for individuals, and therefore to qualify, an individual's countable income could not exceed $771. But as mentioned,

15

because not all income is counted, one may earn more than $771 and still qualify for SSI benefits.

(b) <u>SSI Resource Test</u>: "Resources means cash or other liquid assets or any real or personal property that an individual owns and could convert to cash to be used for support and maintenance." (20 C.F.R. § 416.120(c)(3); see § 416.1201(a) [resources defined].) An unmarried claimant having *countable* resources in excess of $2,000 will not be eligible for SSI. (2 Soc. Sec. Law & Prac. (Feb. 2020) § 20:14.)

(c) <u>When Income May Be Considered an SSI Resource:</u> "SSA policy states that, in general, anything that a claimant receives in a month, from any source, is considered income to the claimant provided that the claimant can use the item to meet his or her needs for food or shelter. However, anything that a claimant owned prior to a given month is considered a resource for that month." (2 Soc. Sec. Law & Prac. (Feb. 2020) § 19:3, fns. omitted.) Furthermore, "[A]ny item received in a current month is generally income for the current month only[, and] the item may be subject to the resource counting rules if it is held by the claimant until the following month." (*Ibid.*)

3. State Supplementary Payment (SSP) – California provides additional cash benefits to augment federally funded SSI benefits. (20 C.F.R. § 416.2001.) The Social Security Administration administers both SSI and SSP benefits.

In light of the above definitions, we return to our discussion of section 5246(d)(3)'s five percent rule. The Department's arrears collection efforts from an obligor's SSDI are limited to five percent if *the following four elements* are satisfied:

First, the "obligor is disabled."

Second, the obligor "meets the SSI resource test."

Third, the obligor is either "receiving" SSI/SSP "*or*, but for excess income as described in [the federal regulations], would be eligible to receive SSI/SSP."

Fourth, "the obligor has supplied the [Department] with proof of eligibility for *and, if applicable,* receipt of, SSI/SSP or [SSDI]." (§ 5246(d)(3).)

16

The first element clearly includes all SSDI recipients, who must prove they are disabled to be eligible for benefits.

The second and third elements sound similar but address different legislative concerns. As discussed, the federal regulations define a person's monthly resources differently from his or her counted income. An obligor may meet the SSI resource test, but not the income test, and vice versa.

Accordingly, the second element clearly includes all obligors who receive SSI benefits (having met the SSI resource test to qualify for those benefits). This element also embraces SSDI recipients who meet the SSI resource test (having less than $2,000 in sellable assets) but were disqualified for other reasons.

The third element is slightly more complicated due to its reference to all SSI eligibility elements and the use of the word "or"—signaling a disjunctive test. It requires that the obligor either receive SSI benefits, or would be eligible for those benefits but for excess income (as uniquely defined in the federal regulations).[6] Thus, the latter part of this third element refers to the two remaining SSI requirements other than the income test or the SSI resource test (previously established in the second element). As discussed above, eligibility for SSI benefits also requires both a certain residency/citizenship status and excludes fleeing fugitives and probation/parole violators. Thus, the third element prohibits obligors falling into those categories from taking advantage of the five percent rule.

---

[6] "There are different types of income, earned and unearned, and we have rules for counting each. The earned income rules are described in [sections] 416.1110 through 416.1112 and the unearned income rules are described in [sections] 416.1120 through 416.1124. One type of unearned income is in-kind support and maintenance (food or shelter). The way we value it depends on your living arrangement. . . . In some situations we must consider the income of certain people with whom you live as available to you and part of your income. . . . We use all of these rules to determine the amount of your countable income—the amount that is left after we subtract what is not income or is not counted." (20 C.F.R. § 416.1104.)

The fourth element, clarifies the burden is on the obligor to provide proof of eligibility *and* proof of receipt of SSI/SSDI benefits. The obligor, rather than the Department, is in the best position to present evidence of his or her financial circumstances, applications, and receipt of benefits.

To briefly summarize, an SSDI recipient can satisfy the four elements of the five percent rule if he or she meets all the SSI eligibility requirements, with the exception of the specified limitation on countable income. Our standard of review is well settled. We review de novo issues concerning the Department's authority to collect arrears from Father's SSDI benefits, "[t]he court's factual findings, however, are subject to the substantial evidence standard of review. [Citation.]" (*Land Partners, LLC v. County of Orange* (2018) 19 Cal.App.5th 741, 745.)

C. *Analysis of Five Percent Rule*

The parties and trial court agreed Father clearly established the first and fourth elements of the five percent rule, i.e., he was disabled and could prove receipt of SSDI benefits. As for the rule's third element, the parties dispute whether Father presented sufficient evidence he met the requirements of the SSI resource test. At the hearing and on appeal, Father maintained his income and expense declaration provided sufficient evidence he held less than $2,000 in assets, as defined by the federal guidelines. On appeal, Father raises the additional argument that we should adopt the holding of *In re Marriage of Hopkins* (2009) 173 Cal.App.4th 281, 287 (*Hopkins*). The *Hopkins* court interpreted the statutory language found in section 17450(c)(2) [collection action/bank levies exemption], as meaning an obligor need only prove he is disabled and received SSDI benefits, and nothing else. In other words, Father asks us to hold he only needed to establish receipt of SSDI benefits and he did not have to demonstrate he met the SSI resource test.

We begin with Father's evidentiary claim. The trial court did not elaborate in its ruling as to why Father's income and expense declaration or personal declarations

18

were insufficient to trigger the five percent rule. At the hearing, Father asserted his income and expense declaration clearly showed he had zero assets. Indeed, Father wrote "0" on the line asking him for balances in his savings and checking accounts. However, as noted by the Department in its briefing, Father left blanks next to the sections asking the declarant about other assets such as stocks, bonds, real or personal property.

It would have been unreasonable for the court to infer Father intended those blank lines to be treated as zeros because he was inconsistent and did not leave all the lines blank. Moreover, when the court asked Mother if she had anything to add to the discussion about Father's income and resources she responded as follows: "I want to know if [he] still owns the horse. Is a horse an asset?" As defined by the federal regulations, the SSI resource test takes into consideration anything the obligor "could convert to cash to be used for support and maintenance," which would certainly include a horse. (20 C.F.R. § 416.120(c)(3); see § 416.1201(a) [resources defined].)

We conclude there was ample evidence to support the court's factual finding Father did not present sufficient documentation to satisfy the second element of the five percent rule. Little weight should be given to an incomplete income and expense declaration filed three years before the hearing. Likewise, the court may reject Father's uncorroborated, self-serving declarations of hardship. Father needed to supply financial documents demonstrating his assets fell below the $2,000 limit required by the SSI resource test.

Turning next to the *Hopkins* case, we respectfully decline to follow its statutory interpretation of the four elements applicable to SSDI recipients. (*Hopkins, supra,* 173 Cal.App.4th at pp. 288-289.) As aptly noted by the *Hopkins* court in its 2009 opinion, "there is a dearth of reported case law addressing this statutory scheme." (*Id.* at p. 287.) The same holds true over a decade later. We found no published cases, other than the *Hopkins* decision, analyzing the legislature's decision in 2001 to place limits on

19

the collection of delinquent child support obligations from SSDI benefits (§ 5246(d)(3)) and bank accounts (§ 17450, subd. (c)(2)).

In *Hopkins*, the court was concerned with interpretation of the four part test in the context of interpreting section 17450(c)(2). (*Hopkins, supra,* 173 Cal.App.4th at p. 286.) Although this is a different statute from the one at issue in this case, Father is correct that the same statutory interpretation would apply to both section 17450(c)(2), and section 5246(d)(3), because the language is identical, enacted as part of the same assembly bill to provide relief to impoverished and disabled SSDI recipients. (Legis. Counsel's Dig., Assem. Bill No. 891 (2001-2002 Reg. Sess.)

It is also true that while we typically follow the decisions of other appellate districts or divisions, those decisions are not binding on us, and we follow them only if we lack good reason to disagree. (*Sarti v. Salt Creek Ltd.* (2008) 167 Cal.App.4th 1187, 1194.) After our review of the federal guidelines, Social Security Act terminology, the statutory language, and the applicable legislative history, we have good reason to disagree with the *Hopkins* court's analysis of the statutory language.

In *Hopkins*, the court held the obligor's undisputed receipt of SSDI exempted his assets from levy because he satisfied the first and fourth parts of the test. (*Hopkins, supra,* 173 Cal.App.4th at p. 289.) It rejected the Department's interpretation that an obligor must also provide evidence related to parts two and three "because they are mutually exclusive." (*Id.* at p. 288.) It reasoned, "Either an obligor meets the income test and is receiving SSI/SSP payments or the disabled obligor does not meet the income test and therefore is not receiving SSI/SSP payments, but receives SSDI benefits instead. Second, if an obligor meets parts one and four of the Department's stated test, then the obligor necessarily must have met either part two or three. [¶] An obligor who is disabled and who has provided proof of receipt of SSI/SSP or SSDI payments necessarily must have either met the income test for receipt of SSI/SSP payments or exceeds the income requirement but is otherwise eligible. Title 20 of the Code of Federal

20

Regulations part 416.202 (2009) sets forth the eligibility requirements for receipt of SSI/SSP payments: A person who (1) is disabled, (2) is a citizen or legal resident, (3) meets the income limitations, and (4) is not in violation of parole or probation or fleeing prosecution for a crime." (*Id.* at pp. 288-289.) The court stated that to interpret the statute as excluding an obligor collecting SSDI benefits, but who do not meet "the income test for SSI/SSP payments" would render "the reference to SSDI benefits in the subdivision surplusage" and "would vitiate the express reference to SSDI payments." (*Id.* at p. 289.)

It appears the *Hopkins* court's legal analysis is based on the premise that the SSI resource test and SSI income test are indistinguishable, referring collectively to the two tests as relating to the requirement of meeting certain "income limitations." (*Hopkins, supra,* 173 Cal.App.4th at p. 289.) Our review of the applicable federal regulations revealed there are five, not four, SSI/SSP eligibility requirements because the terms "income" and "resources" are distinguishable limitations to SSI/SSP benefits. The SSI resource test involves examination of a person's preexisting assets that could be "converted to cash" such as a horse. While the income limitation involves consideration of what the person receives each month from outside sources, such as employment or other benefits. For this reason, it is possible that an SSDI recipient could satisfy the third element (SSI eligible but for excess income) but not the second element (SSI resource test).

This interpretation is supported by the legislative history. "This bill arises from circumstances in which disabled non-custodial parents have been unable to get a modification on their child support obligations even though they are no longer able to work *and subsist* on public disability checks. [¶] As originally introduced, the bill was much broader, seeking to amend several sections of the Family Code . . . [¶] . . . however, the bill was substantially narrowed and simplified. In its current form, the bill would prohibit the [Department] from garnishing a disabled obligor's benefits in an amount that

21

would reduce his or her income below that allowed by certain public benefits programs for disabled persons."  (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 891 (2001-2002 Reg. Sess.) as amended Apr. 23, 2001, pp. 1-2., italics added.)  The Legislature was clearly focused on helping SSDI recipients who were nearly or already destitute, having no means for survival other than disability checks.

The committee discussed letters sent in support of the five percent rule, who had "first-hand experience with 'the real hardship child support obligations have on the disabled poor.'"  (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 891 (2001-2002 Reg. Sess.) as amended Apr. 23, 2001, p. 3.)  As noted by one Los Angeles commissioner, "[C]urrent law already exempts a non-custodial parent's SSI benefits from child support collection because 'it has long been recognized that such benefits are scarcely enough to sustain a human life,' . . . ."  (*Ibid.*)  The bill was designed to "extend this safety net to disabled individuals whose income from other disability benefits is at or below the very low SSI benefit amount."  (*Ibid*.)  According to the author, the bill was to "keep disabled non-custodial parents from becoming homeless" because they often cannot modify their support obligation before they owe thousands of dollars in arrears."  (*Ibid.*)  "[The Department] will garnish the obligor's benefit checks or bank account to pay the county for back welfare payments.  In an example cited by supporters of the bill, a disabled obligor whose disability check was garnished in this fashion no longer had the funds to pay for his board and care facility, which evicted him."  (*Ibid.*)

As explained previously in this opinion, not all SSDI recipients are on the verge of homelessness.  The second element of the five percent rule squarely addresses this point, requiring that obligors who receive SSDI payments in lieu of income must also satisfy the SSI resource test, i.e., lack of assets available to sell to avoid eviction.

For the above reasons, we decline to follow the *Hopkins* court's holding that the Legislature intended all obligors receiving SSDI to benefit from the safety net created by sections 5246(d)(3) and 17459(c)(2).  The plain language and legislative

22

history support the conclusion every element of the four part test must be satisfied. Some, but not all, disabled obligors receiving SSDI benefits will be able to establish he or she "meets the SSI resource test" (as defined by the federal regulations), but was denied SSI benefits for other reasons. The SSI resource and income tests are not mutually exclusive.

Consequently, to take advantage of the garnishment five percent rule, Father was required to establish he satisfied the SSI resource test and would have qualified for SSI but for the SSI income test, in addition to proving he received SSDI benefits. He failed to do so, and therefore, the Department had authority to withhold up to a maximum of 50 percent of his SSDI benefits for arrears until the court ordered he need only contribute $375 per month.

D. *Effect of Mother's Derivative Benefits*

Father maintains the Department could not withhold money from his SSDI because the Social Security Agency (SSA) was paying Mother derivative benefits that exceeded his monthly support and arrears obligation. We disagree.

"A child not living in the same household as the disabled person may receive *derivative* benefits on account of a parent's disability. (42 U.S.C. § 402(d).) If a beneficiary is under the age of 18, the SSA will generally pay benefits to a representative payee, preferably the custodial parent. (20 C.F.R. §§ 404.2001(b)(2), 404.2021(c)(1) . . . .)" (*Y.H. v. M.H.* (2018) 25 Cal.App.5th 300, 305 (*Y.H.*).) California law, section 4504, subdivision (a)), makes this preference mandatory by directing the child's custodial parent to receive these payments and directing the non-custodial parent to "cooperate with the custodial parent" in completing any necessary paperwork. (§ 4504, subd. (a).) In this case, Mother received $1,116 per month in SSDI derivative benefits as the representative payee for her children.

We begin with an overview of how a child's derivative benefit is treated for child-support purposes. Section 4504, subdivision (b), provides, "If the court has ordered

23

a noncustodial parent to pay for the support of a child, payments for the support of the child made by the federal government . . . because of the . . . disability of the noncustodial parent and received by the custodial parent . . . shall be credited toward the amount ordered by the court to be paid by the noncustodial parent for support of the child unless the payments made by the federal government were taken into consideration by the court in determining the amount of support to be paid.  Any payments shall be credited in the order set forth in [s]ection 695.221 of the Code of Civil Procedure."

"Code of Civil Procedure section 695.221 provides money should be credited in the following order:  (1) 'against the current month's support'; (2) 'against the principal amount of the judgment remaining unsatisfied'; and then (3) 'against the accrued interest that remains unsatisfied.'" (*In re Marriage of Hall & Frencher* (2016) 247 Cal.App.4th 23, 26.)  Accordingly, a trial court has the option of choosing one of two approaches:  (1) it may consider the derivative benefits in fixing the guideline formula support amount; or (2) it may allow a direct-benefit credit against the formula amount. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1162.)  For example, under the second approach, a court may exclude the derivative benefit in calculating the amount of child support owed by the noncustodial parent, and then credit the benefit against any payments owed.  (*In re Marriage of Daugherty* (2014) 232 Cal.App.4th 463, 466.)

Here, the parties do not say which approach was utilized.  Based on the figures listed in the court's guideline calculation sheet contained in our record, it appears the court utilized the second approach when it modified Father's support obligation in February 2016.  The court attributed Father's SSDI benefits as income, but did not include the derivative benefit in fixing the guideline formula support amount of $836.

However, for reasons unknown, the court did not credit the entire derivate support benefit as set forth in Code of Civil Procedure section 695.221.  Instead, the court initially ordered only a $280 credit for the derivative benefits and required that Father pay $375 per month for arrears.  This order was not in compliance with section 4504 or Code

24

of Civil Procedure section 695.221. Several months later, the court correctly "modified" the order to reflect Father must receive credit for the entire derivative benefit as required by law.

Accordingly, Father was correct that derivative benefits completely satisfied his $836 child support obligation. And when one of the children emancipated, the support obligation decreased to $526, leaving a larger sum to be credited against arrears. Any excess amount, before or after the reduction, must be applied to what Father owed for unpaid support arrears. (§ 4504, subd. (a); Code Civ. Proc., § 695.221.)

Father provides no authority, and we found none, to support his argument the excess amount should not be applied towards his $160,000 in arrears but rather must be credited against the small payment ($375) the court ordered Father to pay each month. The court had authority to order Father pay a minimum amount of $375 each month towards arrears in addition to the credit he would receive from derivative benefits.

Similarly, we found no support for the Department's assertion the *court ordered it* to withdraw $375 from Father's SSDI benefits. The record clearly shows the court's order simply stated Father must pay $375 each month towards arrears. However, we recognize section 5246 gave the Department authority to issue an income withholding order from Father's SSDI benefits to cover the amount of court-ordered arrears. As discussed above, the 25/50 rule applied unless Father (1) established he qualified for the five percent rule or (2) the court ordered a specific arrears payment. In this case, the court ordered a specific payment of $375, eliminating the Department's ability to continue applying the 25/50 rule. We conclude the court sensibly balanced Father's disability and reduced SSDI income of $2,234 against his obligation to repay over $160,000 owed to his children and spouse for their support. It was reasonable to determine the children will directly benefit from receiving $375 per month plus use of the SSDI derivative benefit payments.

25

E. *Relevant Legal Principles About Reimbursement*

The final question concerns whether the Department must reimburse Father for any overpayments made towards arrears. To briefly summarize, the Department could withdraw $1,116 each month under the 25/50 rule until March 2016, and then it was limited to the court's order of $375 per month. The Department does not maintain it strictly adhered to withdrawing these sums. It does not dispute it may have over collected from Father's SSDI funds to pay Mother for past owed support.

Father asserts section 3653 and *In re Marriage of Dandona & Araluce* (2001) 91 Cal.App.4th 1120 (*Dandona*), support his theory the court can require the Department to reimburse Father for overpayments to arrears. He misconstrues the reach of this legal authority.

Section 3653, subdivision (a), provides modification or termination of a support order may be retroactive only to the filing date of the notice of motion or to any subsequent date. Subdivision (d) of section 3653 provides that when the court enters orders that decrease or terminate support retroactively, it *may* order the support recipient to repay the obligor for any overpayments. "The court may order that the *repayment by the support obligee* shall be made over any period of time and in any manner, including, but not limited to, by an offset against future support payments or wage assignment, as the court deems just and reasonable. In determining whether to order a repayment, and in establishing the terms of repayment, the court shall consider all of the following factors: [¶] (1) The amount to be repaid. [¶] (2) The duration of the support order prior to modification or termination. [¶] (3) The financial impact on the support obligee of any particular method of repayment such as an offset against future support payments or wage assignment. [¶] (4) Any other facts or circumstances that the court deems relevant." (Italics added.)

Section 3653 does not support Father's reimbursement theory. First, it clearly applies to a specific kind of overpayment, i.e., one created when a trial court

26

orders a retroactive reduction in monthly support. It plainly does not concern payments made towards arrearages. We have no grounds to broadly interpret the statute to require repayment anytime an obligor overpays support or arrears. Second, the statutory provision requires that repayment come from the person who received the funds ("the support obligee") not the Department. (§ 3653.)

The *Dandona* court applied section 3653 to a case where the trial court ordered the support obligee to repay child/spousal support to an obligor due to a retroactive reduction in support. (*Dandona, supra,* 91 Cal.App.4th at p. 1123.) In that case, Father filed a motion to modify support in January 1999, and the court granted his request over a year later in March 2000. (*Ibid.*) The trial court determined that "while [Father's] motion was pending, he overpaid [Mother] $6,734 for child support and $4,256 for spousal support" and ordered Mother to repay Father "the overpayment of $10,990." (*Ibid.*) The court rejected Mother's theory she was not required to reimburse Father for his 1999 overpayments. She asserted the Legislature amended section 3653 in 1999 to eliminate the repayment obligation and did not add it back into the statute until 2000. (*Id.* at pp. 1123-1124.) The *Dandona* court resolved the issue of whether the 2000 amendment was retroactive to support payments made in 1999. (*Id.* at p. 1124.)

Father misreads the *Dandona* case as "expanding" section 3653 to provide reimbursement for "'"any amounts previously" overpaid under prior court orders.'" This quoted fragment must be read in context. The court held the amended statute was retroactive for the following reason: "Section 3653 does not expressly state it applies to recovery of 1999 overpayments. But the language of the section shows the Legislature intended it to be retroactive. Support obligors are to be reimbursed for 'any amounts previously' overpaid under prior court orders. (§ 3653, subd. (c).)" (*Dandona, supra,* 91 Cal.App.4th at p. 1124.)

Thus, for purposes of its analysis on retroactivity, the court *shortened* the statutory provision substituting "overpaid" for the portion of the statute providing

27

reimbursement for "'any amounts previously *paid* by the support obligor pursuant to the prior order *that are in excess of the amounts due pursuant to the retroactive order*.'" (*Dandona, supra*, 91 Cal.App.4th at p. 1124, original italics omitted, italics added.)  The court did not expand section 3653 to require repayments for all types of overpayments. Moreover, the case is factually inapt for the additional reason that there was no indication Father owed arrears.  His overpayment was towards support only.  (*Id.* at p. 1123.)

Neither party offered any legal analysis for the situation where there has been an overpayment for reasons other than a retroactive court order modifying support. We are aware of legal authority holding a court has the discretion to credit overpayments of support to outstanding arrears.  "'[T]he trial court may give credit for past overpayment (*In re Marriage of Peet* (1978) 84 Cal.App.3d 974, 980-981) . . . or take into consideration "whether the debtor had satisfied or otherwise discharged the obligation imposed by the original order."' [Citation.]"  (*Y.H., supra,* 25 Cal.App.5th at p. 307.)  Moreover, under section 290, the court had "broad enforcement power to determine the manner in which its child support order is enforced" and may give credit against arrears for past overpayments to support.  (*Ibid.*)  We found no case authority or policy served by authorizing reimbursement of overpayments to arrears when an obligor owes in excess of $160,000 in past unpaid support.  Father was not without a remedy to halt unauthorized withdrawals from his SSDI.  He may move to quash an inaccurate assignment order (§ 5270).  In light of all of the above, we conclude the court properly denied Father's request for reimbursement of funds given to Mother for past owed support.

III.  *Remaining Arguments*

Father's opening brief is broken into five sections.  The "ARGUMENT" section (from pages 15 to 31), which has a subsection titled, "DISCUSSION," raises all the issues we have analyzed above.  The last section titled, "STANDARD OF REVIEW" lists six issues, three raised earlier in the discussion section, and three new issues.

Specifically, Father raises for the first time in his brief the court abused its discretion by (1) "failing to approve [his] [proposed] judgment for the March 23, 2018 hearing[;]" (2) "failing to continue evidentiary hearings . . . regarding the availability of sanctions against the Department . . . ultimately ruling that sanctions were not available, as [it] did not even read [his] brief on the subject at anytime whatsoever prior to the March 23, 2018 hearing as shown above[;]" and (3) claiming the court did not receive Father's brief before the hearing about whether the five percent rule applied, depriving Father of a fair trial.

Because Father merely offers his opinion about these three issues, without providing legal analysis or supporting record citations, we deem them waived. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 [must present relevant legal authority and reasoned argument on each point made]; *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [appellate court not required to consider points not supported by citation to authorities or record].) It is not this court's duty to develop legal arguments for the parties. (*Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1196, fn. 2.)

## DISPOSITION

We affirm the court's June 2018 order confirming Respondent may withdraw money from Appellant's SSDI benefits for arrears, it need not repay Appellant for any overpayments to arrears, and sanctions were not warranted.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JENNIFER S. LAK, | |
| Respondent, | G056784 |
| v. | (Super. Ct. No. 09D001393) |
| DANIEL K. LAK, | O R D E R |
| Appellant, | |
| ORANGE COUNTY DEPARTMENT OF CHILD SUPPORT SERVICES, | |
| Intervener and Respondent. | |

       The Orange County Department of Child Support has requested that our opinion filed May 22, 2020, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED. The opinion is ordered published in the Official Reports.

O'LEARY, P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.